UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

00 SEP 29 PM 3: 44

U.S. DISTRICT COURT
N.D. OF ALABAMA

M.T. PACKAGING, INC.,                    }

    Plaintiff,                          }

v.                                       }      CASE NO. CV 97-B-2527-S

BIG B DRUGS, INC., et al.,               }

    Defendants.                         }

ENTERED

SEP 2 9 2000

## MEMORANDUM OPINION

    This matter was tried before the court sitting without a jury. Plaintiff M.T. Packaging,

Inc. ("plaintiff" or "MTP") commenced this action against defendants, Big B Drugs, Inc. ("Big

B") and Revco D.S., Inc. ("Revco") on September 22, 1997. On November 17, 1997, plaintiff

sought leave to file an amended complaint. The complaint, as amended, added CVS Corporation

("CVS")[1] as a defendant and asserted three counts: breach of contract, breach of the implied

covenant of good faith and fair dealing, and promissory estoppel. The amended complaint

sought damages of $723,717.26 and any other damages to which plaintiff would be entitled.

Defendants' answer denied the existence of a contract and raised several defenses, including the

statute of frauds. In their Second Amended Answer, defendants asserted a counterclaim of

fraudulent misrepresentation and non-disclosure on the part of plaintiff. Defendants sought

compensatory and punitive damages in an amount to be determined by the court. Upon review

of the evidence submitted at trial, the arguments of counsel, and the relevant law, the court finds

in favor of defendants as to plaintiff's claims of breach of contract, breach of the implied

covenant of good faith and fair dealing, and promissory estoppel. The court finds in favor of

---

    [1] The defendants are related through a series of corporate mergers. Collectively, they
will be referred to as "defendants" or "counter-claimants."



defendants as to their counterclaim of fraudulent misrepresentation and non-disclosure and awards $77,377 in compensatory damages and $232,131 in punitive damages.  In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the court enters the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff is a New York-based distributor of plastic merchandise bags and related products, which are manufactured for retail customers, such as Big B, throughout the United States.  (Tr. at 42-43, 291-92.)[2]  Customer purchases are placed in these bags upon checkout from the retail store.  (Tr. at 121, 535-36.)  Plaintiff has no manufacturing facilities and does not manufacture any of the products it sells.  (Tr. at 229-37, 240-43.)

**A.     1995 Contract**

The relationship between plaintiff and defendants began in late 1994 or early 1995, when Charlie Tolep ("Tolep"), an employee of MTP,  first began contacting Big B in an attempt to gain Big B's business.  (Tr. at 46-47, 248-50, 252.)  Jack Elefant ("Elefant"), plaintiff's Vice President of Sales, then began contacting Janice Whaley ("Whaley"), a buyer responsible for purchasing bags and paper products for Big B, continuing the efforts to gain Big B's business.  (Tr. at 40, 47, 248-52, 263-64, 577.)  At this time, Big B primarily used paper bags.  (Tr. at 47, 53, 576.)  Elefant proposed that Big B begin using only plastic bags which would be less expensive than the paper bags.  (Tr. at 47, 577, 580.)

---

[2]  Throughout this opinion references to the trial transcript will be cited as "Tr.;" references to plaintiff's exhibits will be cited as "PX;" and references to defendants' exhibits will be cited as "DX."

2

Elefant provided Whaley with samples of the plastic bags so that Whaley and the buying committee could examine the bags and determine which, if any, satisfied Big B's requirements. (Tr. at 53-55, 580-81.) Elefant and Whaley discussed different bag specifications, including bag sizes and bag gauges.[3] (Tr. at 265, 581-85.) Elefant informed Whaley that he would have to know the bag size and bag gauge before he could provide a price quotation. (Tr. at 269.)

Whaley and Elefant reached an agreement regarding the sizes and gauges of the bags which Big B would purchase from plaintiff. (Tr. at 55, 270-75, 581-82.) On April 28, 1995, Elefant sent a contract, in letter form, to Whaley. (PX 7.) The contract stated "M.T. Packaging will deliver 30 truckloads of bags per year at a[n] estimated usage of 2-3 truckloads per month. These bags will be delivered at an agreed upon schedule between M.T. Packaging and Big B Drugs." (*Id.*) The contract also specified the dimensions and the price (per thousand) of each size bag: $9.70 for the small bags (9 x 12); $14.76 for the medium bags (13 x 10.5 x 5); and $20.40 for the large bags (17 x 14 5/8 x 3.5).[4] (*Id.*)

Whaley received samples of the bags accompanied by a letter documenting that such samples had been sent.[5] (Tr. 304-06; DX 9.) The bags agreed upon in the contract were based

---

[3] Size and gauge are the primary factors affecting the cost of the bags because these factors determine the amount of resin which is necessary to manufacture the bag. (Tr. at 266-68.) Bag gauge refers to the thickness of the bag material. (PX 33 (Erjavec Deposition) at 16.) Resin is the only significant raw material used in producing the plastic bags, and it represents about fifty percent of the cost of the plastic bags. (Tr. at 146, 150, 267, 406; PX 33 at 76.)

[4] Big B initially agreed to purchase the small, medium, and large bags from plaintiff. (PX 7.) However, in August of 1995, Big B also began purchasing extra large bags. (Tr. at 275-76, 375-76, 466-67; DX 47; DX 48.) These bags were 21 by 20.75 by 4. (Tr. at 376; DX 47.) PCL charged MTP $27.31 per thousand for the extra large bags. (Tr. at 376; DX 47.) MTP's price to Big B was $33.50 per thousand. (Tr. at 377-78; DX 48.)

[5] Although this letter indicates that it is from Elefant to Whaley, the letter was actually written by someone at PCL, who, as discussed below, was the actual manufacturer of the bags.

3

on the samples provided to Whaley by Elefant. (Tr. at 55, 275, 582.) Whaley and Elefant both

understood that the construction of the bags to be provided to Big B would be identical to that of

the sample bags. (Tr. at 275, 582.) Whaley and Elefant also agreed that plaintiff would provide

Drugs For Less[6] bags and Christmas bags. (Tr. at 50-51, 605-06.) The Big B bags, Drugs For

Less bags, and Christmas bags were all included in one agreement, and the bags for each were

the same prices and sizes. (*Id.*)

During this same time period, Elefant was also negotiating with PCL Packaging, Inc.

("PCL"), a manufacturer of plastic bags. (Tr. at 60, 306-10.) PCL agreed to manufacture the

bags to be supplied to Big B. (Tr. at 45, 58.) During the course of the negotiations between

plaintiff and Big B, and even after the contracts were signed, Elefant never told Big B that PCL

Packaging, Inc. manufactured the bags; rather, he tried to keep this fact hidden.[7] (Tr. at 60-

_____

(DX 9; Tr. at 305-06.) Elefant had instructed PCL to put the names of Elefant and MTP on the
letter that went out with the samples. (Tr. at 305.)

[6] Elefant testified that he dealt with Drugs For Less and Big B as one entity with two
different names. (Tr. at 50.) Mark Horning, the CVS corporate representative at trial, testified
that Drugs For Less and Big B were separate companies. (Tr. at 671-72.)

[7] Elefant testified that he would never have volunteered the information that MTP was
not the manufacturer of Big B's bags. (Tr. at 285-88.) Whaley testified that, as long as she
received the bags and was satisfied with the bags, she did not care who manufactured them. (Tr.
at 619.) The court notes that MTP's failure to disclose it was not the manufacturer of the bags
does not constitute fraud. However, it is illustrative of the deception in which MTP, through its
representative Jack Elefant, engaged.

MTP engaged in fraudulent and deceitful conduct from the inception of the relationship
between plaintiff and defendants. Plaintiff's employees commonly send out introductory letters
to prospective customers. (*See* DX 1.; Tr. at 251-53.) One such letter written to Big B by Tolep
stated that "this company [MTP] has been in the manufacturing and distribution business for
more than fifteen years" and has "facilities in Israel, Canada, and China." (DX 1; *see also* Tr. at
252-55, 258-62.) Elefant testified that he sends out similar letters. (Tr. at 258.) The factories
referenced in the letter are actually factories from which plaintiff purchases the products for their
customers. (Tr. at 254-55.) Further, the Complaint, which Elefant reviewed before it was filed,
and the Amended Complaint stated that plaintiff is "engaged in the business of manufacturing."

4

67, 154, 284-90, 369, 382-83; *see also* Tr. at 440-43.)

The initial agreement between plaintiff and PCL provided that plaintiff would purchase

the bags from PCL at the following prices (per thousand): $6.75 for the small bag; $11.65 for the

medium bag; and $17.75 for the large bag.[8] (Tr. at 78; PX 8.) Elefant placed the first order for

Big B bags with PCL on March 15, 1995, with the gauge specifications as previously agreed

upon by Whaley and Elefant. (Tr. at 306-11; PX 4.) Elefant instructed PCL to pack the bags in

unmarked cartons and leave the eyemark blank.[9] (Tr. at 60-64, 311; PX 3; PX 8; PX 33 at 51-

53.) PCL complied with these instructions. (PX 33 at 52-53.) Thus, by looking at the bags, it

was difficult, if not impossible, for Big B personnel to detect that MTP was not the manufacturer

of the bags.[10] (*See* Tr. at 60-67, 369, 440-43.) On May 2, 1995, Elefant placed a second bag

_____

(Tr. at 290-93; Complaint ¶ 6; Amended Complaint ¶ 6.) Plaintiff's response to defendant's first
set of interrogatories #12, which Elefant signed on behalf of plaintiff verifying the answers,
stated that the bags are "in storage at MTP's facility." (Tr. at 293-97.) However, as established
by the testimony at trial, the bags were actually in storage at PCL's facility. (Tr. at 295-96.)
Elefant also repeatedly represented at trial that plaintiff has a manufacturing facility in Israel.
(Tr. at 44, 45, 229-33.) In fact, plaintiff has no manufacturing facility at all. (Tr. at 229-37, 239-
42.) Not only did Elefant repeatedly misrepresent its manufacturing capabilities to Big B, but he
also repeatedly misrepresented such capabilities to the court. The court did not find Elefant to be
a credible witness.

[8] These prices included the freight charge . (Tr. at 374; PX 33 at 22.)

[9] An eyemark is a strip on the bag about two inches long and one-quarter inch wide,
which contains a mark recognized by the manufacturing machinery. (PX 33 at 51-52.) The
mark conveys to the machinery the appropriate time to cut the plastic. (Tr. at 60-61; PX 33 at
51-52.) It is common in the bag industry for manufacturers to place a symbol on the eyemark
identifying the manufacturer of the bag. (PX 33 at 52; Tr. at 312.) However, per Elefant's
instructions, there was no symbol in the eyemark of the Big B bags to identify PCL as the
manufacturer of the bags. (Tr. at 60-62; PX 33 at 51-53; *see also* DX 43, DX 44, DX 45, and
DX 46.)

[10] The only mention of PCL was on the bills of lading. (Tr. at 66, 440-43.) Some of the
bills of lading included a stamp instructing Big B to contact PCL if there were any problems
with the delivery of the bags. (Tr. at 443.) However, the bills of lading only identified PCL as

order with PCL, requesting the same sizes and gauges that he had specified earlier. (PX 8.)

**B.    Gauge Reduction**

Shortly after placing the second order with PCL, Ron Braun ("Braun"), a PCL Vice President, contacted Elefant and informed him that PCL's out-of-pocket costs associated with manufacturing the Big B bags exceeded the price plaintiff was paying for the bags, and that these "prices [were] clearly unacceptable on a long term basis." (Tr. at 79-80, 315-20; PX 9.) Braun reiterated that PCL's prices for plaintiff's first order of Big B bags were special prices reflecting "conditions" which existed at PCL's facility at the time of the first order. (PX 9.) Braun agreed to fill plaintiff's May 2, 1995, order at the previous prices, but indicated that plaintiff and PCL would have "to face the pricing issue up front now." (PX 9; Tr. at 318-19.)

Elefant then began discussing the situation with Patty Erjavec ("Erjavec"), PCL's General Manager. (Tr. at 84-85; PX 12; PX 33 at 10-11, 35-37.) Elefant felt that he had gotten Big B's business on price, and if he were to go in and raise the price, he would risk losing the Big B account. (Tr. at 322-24; PX 33 at 36-37.) Erjavec informed Elefant that if he insisted on keeping these prices, she would have to change the construction of the bags. (Tr. at 87, 331-34, 342; PX 12; PX 33 at 55-56, 64-65.) Thus, Elefant could either agree to change the construction of the bags or pay more for the bags he was already purchasing. (Tr. at 342.)

Elefant instructed Erjavec to determine the changes necessary to sufficiently reduce the production costs of the bags. (PX 33 at 56, 65; Tr. at 332-33.) Erjavec proposed the following: (1) changing the small bag from a low density bag with a 0.85 gauge to a high density bag with a 0.65 gauge, which would also require a change from three colors on each side to either two

---

the shipper, not the manufacturer. (Tr. at 440-43.)

6

colors on each side or up to four colors on one side; (2) reducing the gauge of the medium bag from 2 over 0.75 to 1.85 over 0.75; and (3) reducing the gauge of the large bag from 2 over 0.75 to 1.85 over 0.75. (Tr. at 85-101, 342-43; PX 12; PX 33 at 65-69, 71-73.)

Elefant and Whaley eventually agreed to print three colors on only one side of the bag. (Tr. at 102.) As to the medium bag, the gauge on the body of the bag stayed the same, but the gauge in the top third of the bag was reduced. (Tr. at 92-93.) The gauge of the large bag was reduced as to both the top and the bottom of the bag. (Tr. at 98-99.) These changes in the construction of the bags lowered PCL's cost of producing the bags, thereby allowing PCL to maintain the initial prices. (PX 12; PX 33 at 65, 71.) On June 1, 1995, Erjavec sent samples of the bags to Elefant. (Tr. at 333-34; PX 12.) Elefant authorized Erjavec to make the proposed changes to the construction of the bags. (Tr. at 342-43; PX 33 at 72.)

The only correspondence between Elefant and Whaley regarding these changes is a June 6, 1995, letter that Elefant sent to Whaley. (Tr. at 343-50; PX 13.) The letter stated that Elefant had "enclosed some new bags for to you [sic] look at regarding you[r] small plastic bags." (PX 13.) In the letter, Elefant recommended that Big B change from low density to high density bags, and listed some advantages in doing so. (PX 13.) He did not, however, reveal that the high density bag is cheaper to manufacture than the low density bag. (Tr. at 341, 351.)

Elefant testified that he also informed Whaley of the proposed changes to the medium and large bags, that he provided samples to her of those proposed changes, and that such changes were acceptable to Whaley. (Tr. at 95, 99, 109-10, 343-52, 354-63.) Elefant testified that the gauge of the bags was an important term in the agreement with Big B and that he knew that any changes had to be agreed upon by Big B. (Tr. at 278-79, 281.) The gauge reduction meant that less resin was used to make the bags. (Tr. at 341.) Thus, the strength characteristics, including

7

puncture resistance, tear resistance, impact strength, and handle strength, were diminished.[11]
(Tr. at 708-10.)

Elefant could give no reason for Whaley's willingness to accept the gauge reduction
without a corresponding price reduction. (Tr. at 354-55, 358-62.) Whaley testified that she did
not believe that she would have agreed to the gauge reduction without a corresponding price
reduction.[12] (Tr. at 590.)

On three prior occasions, MTP provided Big B with samples and documented such in
writing, including the proposed change to the small bags. (*See* Tr. 366; DX 1; DX 9; PX 13.)
Further, Elefant wrote to PCL requesting them to send samples of the new high density small
bags to Big B. (Tr. at 367-68; DX 23.) However, there is no documentation involving a request
by Elefant for PCL to send samples to Big B of the modified medium and large bags. (Tr. at
367-68.) No one at Big B recalls being informed of the gauge reduction in the medium and large

_____

[11] Erjavec testified that the changes did not render the bags weaker or in any way inferior
to the bags as originally agreed upon. (PX 33 at 70.) Elefant testified that the gauge reduction
would render the bags more susceptible to ripping. (Tr. at 359.) Mark Daniels, defendants'
expert, stated that the gauge reduction would affect the functional characteristics of the bag. (Tr.
at 708-10.) He further stated that, because of the decrease in resin, the changes would result in a
less expensive bag to manufacture, to sell in the marketplace, and to sell in the salvage market.
(*Id.*) Plaintiff objected to Daniels' expert testimony, alleging that such testimony did not satisfy
the requirements as established under *Daubert* and its progeny. (Tr. at 697.) Daniels is the
National Accounts Manager for Vanguard Plastics, the world's largest manufacturer of T-shirt
and merchandise bags and has participated in extensive training regarding the manufacturing
process for plastic bags. (Tr. at 686-87; DX 57.) Thus, the court believes that Daniels was
qualified to testify regarding the effect of the gauge reduction. However, even without this
testimony the court is of the opinion that the gauge reduction amounted to a material change in
the construction of the bags.

[12] Whaley testified that she does not recall whether she was informed of the gauge
reduction in the medium and large bags. (Tr. at 588-89, 591, 613-14.) She also testified that she
does not recall whether she received any samples regarding a change to the medium and large
bags, but she would have had to present such changes to her boss, and she does not recall doing
so. (Tr. at 588-92.)

8

bags. (Tr. at 588-91, 660-61.) Mark Tow ("Tow"), one of Whaley's supervisors, testified that although he remembered discussing the change in the small bag from low density to high density, he had no recollection of a discussion pertaining to reduction in the gauges of the medium and large bags. (Tr. at 660-61.) He further testified that he was never provided with samples demonstrating the reduction in gauge in the medium and large bags. (*Id*.)

The court does not find Elefant's testimony credible. The court finds that Elefant never mentioned any changes regarding the construction of the medium and large bags to Big B nor did he provide samples demonstrating such proposed changes. The court further finds that Elefant deliberately failed to inform Big B of the gauge reduction so that Big B would not demand a corresponding price reduction.

The change from low density to high density significantly changed the appearance of the small bag. (Tr. at 115-17, 340-41.) The low density bag included artwork on both sides while the high density bag could only have artwork printed on one side. (Tr. at 101-02.) Additionally, the low density bag had a slick glossy finish while the high density bag had a rougher, "crinkly" finish. (Tr. at 89, 340-41; *compare* DX 43 *with* DX 44, DX 45, and DX 46.) Thus, Elefant could not make the proposed changes to the small bag without informing Big B. On the other hand, the gauge reduction in the medium and large bags did not significantly change the appearance of the bag. (Tr. at 118, 120-21.) Such a change was not readily apparent because the bags appeared the same although they were a little thinner. (Tr. at 120-21.) Thus, it was possible for Elefant to make this change without informing Big B. Further, there were no credible benefits he could offer Big B to convince it to accept cheaper, thinner medium and large bags for the same price it was paying for the thicker bags. (*See* Tr. at 351-62; *compare* DX 43 *with* DX 44, DX 45, and DX 46.)

9

## C. 1996 Contract

### 1. Price Increase

In the summer of 1996, PCL once again informed Elefant that it intended to raise its bag prices, this time due to increases in the cost of resin. (Tr. at 380-81.) At plaintiff's request, PCL provided plaintiff with five memoranda that PCL had received from Dow Chemical ("Dow") regarding resin prices. (Tr. at 381, 386; DX 27.) Elefant testified that he wanted these documents to pass along to Big B in order to attain a price increase from Big B. (Tr. at 386-87.)

In June of 1996, Brian Campbell ("Campbell") took over the responsibility for buying merchandise bags at Big B. (Tr. at 508, 510, 617-18.) Elefant began contacting Campbell, informing him that MTP needed to increase its bag prices. (Tr. at 153-54, 380-82, 516-17.) Over the course of several conversations in early August, 1996, and by a letter, dated August 19, 1996, Elefant informed Campbell that plaintiff's costs had increased significantly due to an increase in resin prices. (Tr. at 143, 150-51, 413-15; PX 19.) Elefant also told Campbell that plaintiff had been absorbing these resin price increases, but that it could not continue to do so. (PX 19; Tr. at 148-50, 413-15.)

The August 19, 1996, letter from Elefant to Campbell was accompanied by the five memoranda that had been sent from Dow Chemical to Patty Erjavec at PCL regarding resin price increases. (PX 19; PX 16; Tr. at 143-45.) In order to conceal that the letters had been sent from Dow Chemical to PCL, and not from Dow Chemical to plaintiff, Elefant "whited out" the PCL company name and address. (*Compare* PX 16 and DX 27; Tr. at 382-83.) The letter accompanying the five memoranda stated:

> I have enclosed copies of letters sent to *us* from Dow Chemical . . . . The price of resin in January was $0.39 per lb. and has increased $0.24 per lb. since then. This is an increase of 60%. For over a year and a half we have maintained our prices

10

and *absorbed all price increases*, however I must now come to you and ask you for some help.

Resin constitutes 50% of the cost involved in producing a bag. Therefore if resin goes up 60% the price of the bag will increase 30%. I am only asking you for an increase of 15% to help cover the increases in *our* cost.

(PX 19) (emphasis added.) Campbell believed that plaintiff manufactured the bags and asked for documentation regarding the new prices. (Tr. at 518, 564.) Accordingly, on August 22, 1996, Elefant again wrote to Campbell, setting out the new pricing arrangement. (DX 28.) This letter also stated, "please understand that these price increases are due to the recent increases in the price of raw material, as indicated in my previous letter . . . ." (*Id.*)

Elefant testified that he masked the PCL name and address on the Dow letters simply because he did not want "to flaunt" the PCL name to Big B. (Tr. at 154, 384.) Elefant further testified that in representing that MTP had absorbed all price increases over the past year and a half, he was actually representing PCL and acting as a middle man. (Tr. at 149.) The court again finds Elefant's testimony not credible. Contrary to his testimony, the court finds that Elefant wanted Campbell to believe that MTP had received the notices directly from Dow, and that MTP itself had incurred the resin price increases.

Elefant testified that, although he could not remember for sure, he would have gotten the information regarding the resin price increase from either an industry publication or from one of his suppliers. (Tr. at 388.) Nonetheless, plaintiff's resin costs did not increase inasmuch as plaintiff did not manufacture the plastic bags and, therefore, did not buy resin. (Tr. at 387, 400.) Additionally, Elefant did not know whether or how much PCL's resin prices actually increased. (Tr. 391-92, 397-99, 403-04.) MTP's costs actually had not increased at all during 1996 though the date of Elefant's letter. (Tr. at 405-09.) The first and only time in which PCL raised its

11

prices to MTP was on August 30, 1996, which was an increase of only about five percent. (Tr. 436; PX 33 at 84-86, 89; DX 29.) Based upon Elefant's representations regarding the resin price increases, Campbell agreed to the fifteen percent price increase and signed a contract provided to him by Elefant. (Tr. at 522, 525, 529, 531.)[13] Elefant signed the agreement on September 3, 1996, and Campbell signed the agreement on September 10, 1996. (PX 20.) Thus, although plaintiff, through Elefant, represented to Big B that it incurred a thirty percent increase and commanded a fifteen percent price increase from Big B, it actually incurred only a five percent price increase.

The agreement between Campbell and Elefant stated: "M.T. Packaging agrees to deliver 4[14] sizes of bags at the agreed upon prices . . . . The bags will be delivered at a rate of 3 truckloads per month for an approximate total of 40-45 million bags per year (based upon previous usage). . . . M.T. Packaging agrees to hold these prices for two years from start of contract." (PX 20.) Under both the 1995 and the 1996 agreements, plaintiff agreed to maintain a sufficient quantity of Big B inscribed bags in order to accommodate Big B's fluctuating needs. (Tr. at 540-41, 623; PX 20; PX 7.)

### 2. *Authority to Enter into Agreement*

Vincent Bruno ("Bruno"), a Senior Vice President and supervisor of all buyers in the Purchasing Department at Big B, including Whaley and Campbell, (Tr. at 11-12), testified that

---

[13] Campbell stated that if he had known that MTP's prices had not risen at all prior to the August 1996 letter, and even if MTP's prices were still competitive, he would not have agreed to the price increase. (Tr. at 524-25.) Campbell also stated that he would not have accepted the fifteen percent price increase if he had known that MTP's prices were only increasing five percent as opposed to thirty percent. (Tr. at 525.)

[14] As noted in note 7, *supra*, Big B began purchasing extra-large bags from plaintiff in August of 1995.

during the time in which he held this position, he possessed written job descriptions applicable to buyers in the Purchasing Department. (Tr. at 14-17, 23.) Bruno kept these job descriptions in his desk file. (Tr. at 23.) However, these files were left for Revco when Revco merged with Big B, and Bruno does not know what happened to those files after he left Big B. (Tr. at 23-24.)

Bruno further testified that these descriptions had been prepared by him for each position in the Purchasing Department at Big B, and that these job descriptions would have allowed Whaley and Campbell to enter into the agreement with MTP "if it meant signing the contract to do business in a professional manner."[15] (Tr. at 19-20; *see also* Tr. at 37.) These job descriptions did not have the specific employee's name, but instead were general job descriptions for buyers of supplies. (Tr. at 27-28.) Thus, Campbell's job description would have been the same as Whaley's. (Tr. at 16.) Bruno testified that under the written job descriptions, Whaley and Campbell would have had the authority to enter into the type of agreement at issue in this case. (Tr. at 35-36.) This is consistent with Whaley's recollection also. (Tr. at 640-47.) Tow also testified that Whaley and Campbell were authorized to enter into the agreement with Big B. (Tr. at 667-68.)

Bruno also stated that he would "authorize the buyers from time to time to enter into agreements with the manufacturers to do whatever is necessary to conduct the manner of business which was in the best interest of Big B." (Tr. at 14.) Bruno further testified that he authorized Whaley to sign the 1995 agreement, and he expects he would have authorized Campbell to sign the 1996 agreement. (Tr. at 22-23.)

_____

[15] The job descriptions did not state whether the buyers had to get approval before signing such agreement. (Tr. at 21.) However, Bruno testified that the buyers usually did get permission to sign the agreements and he would have expected buyers such as Whaley to come to him before signing the agreement. (Tr. at 20-21.)

13

### 3.    *Termination of the Agreement*

On December 23, 1996, Big B and Revco consummated a merger of the two entities.

(Tr. at 549, 671.)  Drugs for Less was part of the merger.  (Tr. at 671-673.)[16]  Elefant

subsequently received a letter from Revco, dated January 15, 1997, which stated:

> Revco's recently acquired subsidiary, Big B, Inc., will no longer require the
> production and delivery of Big B bags by your company, and accordingly Big B
> has determined to terminate, effective immediately, any and all agreements
> between Big B Inc. or any affiliated entity and your company.

(PX 24.)  Around February of 1998, Revco merged with CVS.  (Tr. at 684; Amended Complaint

¶ 12.)[17]

At the time Revco terminated the agreement, PCL had three to four months' supply

(1,619 cases) of floor stock of Big B small bags and seven months' supply (4,646 cases) of floor

stock of Big B extra large bags.  (Tr. at 174-78, 451-53.)  PCL had no floor stock of the medium

and large bags at the time Revco terminated the agreement.  (Tr. at 454, PX 33 at 94.)

The remaining floor stock was manufactured prior to April 15, 1996, when PCL had

excess machine capacity.  (PX 33 at 93-94.)  PCL had previously analyzed what the usage was

going to be for 1996, and produced these bags when machine time was available.  (*Id.*)  Elefant

told PCL that he had a two-year contract with Big B, so PCL did not believe there was any risk

in building the inventory.  (Tr. at 94.)  The last shipment made from PCL to Big B of any size

---

[16] Mark Horning ("Horning"), the CVS corporate representative at trial, testified that
Drugs For Less and Big B were separate companies at the time of the merger and after the
merger.  (Tr. at 671-72.)  The assets of Drugs for Less were sold on November 14, 1997.  (Tr. at
673.)  Seventeen Drugs For Less stores were sold to Fred's Drugs; four were closed; and four
were converted to CVS stores.  (Tr. at 673.)

[17] There were transition periods when Revco purchased Big B, and again when CVS
purchased Revco, involving changing the names, swapping out the products in the stores, *etc.*
(Tr. at 164, 683-84; PX 32 at 35.)

14

bag was on November 18, 1996. (PX 33 at 95.)

## II. DISCUSSION

### A. Breach of Contract

Plaintiff sued defendants on three counts, the first of which was breach of contract.

(Amended Complaint ¶ 15-16.) Plaintiff stated in the Amended Complaint:

> Due to the sudden and unexpected termination, M.T. Packaging was left with an
> enormous inventory of personalized plastic bags, with no potential buyer. The
> value of that inventory amounts to $123,717.26. Lost profits due to the
> unreasonable termination of the contract approximate $600,000.00.

(Amended Complaint ¶ 14.)

#### 1. Duration of the Contract

Plaintiff entered into two contracts with Big B for the sale of plastic merchandise bags.

(PX 7; PX 20.) The first contract (the "1995 contract"), executed between Elefant and Whaley,

was in the form of a letter dated April 28, 1995. (PX 7.) It stated:

> This contract is being offered on April 28, 1995 by and between M.T. Packaging
> and Big B Drugs.
>
> Quantity - M.T. Packaging will deliver 30 truckloads of bags per year at a [sic]
> estimated usage of 2 - 3 truckloads per month. These bags will be delivered at an
> agreed upon schedule between M.T. Packaging and Big B Drugs.

(*Id.*) The 1995 contract did not specify any duration other than "per year;" however, the parties

continued to perform under this agreement for approximately 17 months. (PX 7; Tr. at 626.)

In September of 1996, plaintiff and Big B entered into a new contract (the "1996

contract"), which also provided for the sale of plastic merchandise bags. (PX 20.) Campbell,

Whaley's successor, executed the contract on behalf of Big B. (PX 20; Tr. at 522, 617-18.) The

agreement provided:

15

This contract is being offered by and between M.T. Packaging and Big B Drugs Inc. on September 3, 1996.

Quantity - M.T. Packaging agrees to deliver 4 sizes of bags at the agreed upon prices (noted below). The bags will be delivered at a rate of 3 truckloads per month for an approximate total of 40 - 45 million bags per year (based upon previous usage). Exact delivery will be done at an agreed upon schedule.

Pricing -         Small Bag          - $11.16 per 1000
                  Medium Bag         - $16.98 per 1000
                  Large Bag          - $23.46 per 1000
                  Extra Large Bag    - $38.53 per 1000

M.T. Packaging agrees to hold these prices for two years from start of contract.

(PX 20.) Elefant signed the contract on September 3, 1996, and Campbell signed the contract on September 10, 1996. (*Id.*)

### a.    Terminable At Will

The court concludes that the contract in issue (the 1996 contract) was of indefinite duration and, therefore, terminable at will. Because the contract in issue involves the sale of goods, it is governed by Alabama's version of the Uniform Commercial Code ("UCC"). The UCC is codified under Title 7 of the Alabama Code. The relevant portion, Article 2 of the UCC - Sales, is found at §§ 7-2-101 through 7-2-725. Article 2 "applies to transactions in goods." Ala. Code § 7-2-102 (1975). "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. . . ." Ala. Code § 7-2-105(1) (1975). Alabama Code § 7-2-309(2) (1975) provides: "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." Additionally, courts may look to the apparent intentions of the contracting parties when

16

interpreting contracts.[18]

The language in the 1996 letter agreement does not establish a two-year contract. The agreement itself does not reference any definite duration. The only references to time in the agreement are to the estimated number of bag deliveries "per month" and "per year," and the statement that plaintiff "agrees to hold these prices for two years from the start of the contract." (PX 20.) Nothing specifies the duration of the contract. *See Zidell Explorations, Inc. v. Conval International, Ltd.,* 719 F.2d 1465, 1473 (9th Cir. 1983) ("Where no minimum duration is stated in a contract, the general rule is that it is terminable at will by either party."); *Globemaster, Inc. v. Magic Amer. Chem. Corp.,* 386 F.2d 420, 421 (6th Cir. 1967) (finding that a requirements contract for the purchase of adhesives, which contained no definite durational term, was terminable at will); *Upsher-Smith Laboratories Inc. v. Mylan Laboratories Inc.,* 944 F.Supp. 1411, 1421-22, 1428 (D. Minn. 1996) (finding contract was of indefinite duration where letter agreement listed prices which had been agreed upon by the parties; listed minimum order sizes; stated that purchases "will be submitted via a rolling 12 month forecast," to be updated "by the 15th of each month," and firm purchase orders would be sent 90 days in advance of shipment; and stated that the frequency of the orders would retain some flexibility during the first six months of the arrangement, but that the flexibility would be limited thereafter); *Hayes v. Northwood Panelboard Co.,* 415 N.W.2d 687, 691 (Minn. Ct. App. 1987) (letter agreement stating that purchases of lumber will be made "annually" is an agreement of indefinite duration).

Additionally, Elefant's testimony regarding his actions subsequent to MTP's termination by Revco supports the finding that the contract was of indefinite duration, and therefore,

---

[18] *See, supra,* note 30.

terminable at will. Elefant testified that after being notified by Revco of its decision to terminate the agreement, he attempted to submit a bid to Revco for the supply of bags from that point forward. (Tr. at 863.)  MTP would not have been compelled to bid on new business if it already had a binding contract.  Elefant also made a claim to Revco only for the inventory of Big B bags that remained in floor stock at PCL. (Tr. at 862, 865.)  Elefant did not initially claim that Revco was obligated to continue to buy bags other than the inventory or that Revco was obligated to reimburse MTP for lost profits on the Big B account.  (*Id.*)  MTP's claim would not have been limited to floor stock if it had a binding two-year sales contract from Big B.  Thus, Elefant's conduct on behalf of MTP following Revco's termination of the agreement is inconsistent with Elefant's testimony that he believed that there was a binding two-year contract between MTP and Big B which would be enforceable against Revco.

Campbell's testimony also supports the finding that the contract was of indefinitie duration.  Campbell testified that he and Elefant never discussed the duration or term of the agreement prior to the execution of the agreement.  (Tr. at 870.)  He also testified that he did not consider the agreement to be a two-year contract; rather, he considered it only to be a pricing agreement that either party had the power to terminate at any time.  (Tr. at 871.)

The parties' course of dealing under the April 1995 letter agreement also supports the finding that the contract was of indefinite duration.  The 1995 agreement, like the 1996 agreement, included an estimate of the number of truckloads of bags to be delivered "per month" and "per year."  (PX 7; PX 20.)  The parties, however, operated under the 1995 agreement for a period of approximately 17 months, until MTP terminated the agreement by instituting a price increase.  (PX 7; PX 20; Tr. at 626.)  Thus, the court concludes that the parties did not consider the original agreement to have a binding one-year duration.  Similarly, there is nothing about the

18

September 1996 agreement that indicates definitively that the parties intended it to have a binding two-year duration.

The court's finding that the agreement was of indefinite duration is also supported by policy considerations. The court agrees with the following statements by the United States Court of Appeals for the Fifth Circuit:

> Although authorities on § 2-309 are sparse as to when a contract is considered indefinite, strong policy reasons support the presumption in favor of interpreting the contract as one of indefinite term. First, common sense tells us that parties ordinarily do not intend to maintain their business relationships forever. Second, one of the important goals of the UCC – to promote mutually beneficial business dealings – is not fostered if the parties are required to remain in the business relationship after it has soured.

*Delta Services & Equipment, Inc. v. Ryko Manufacturing Co.,* 908 F.2d 7, 11 (5th Cir. 1990). For all the reasons discussed above, the court is of the opinion that the contract was one of indefinite duration, and accordingly, was terminable at will under Ala. Code, § 7-2-309(2).[19]

### b.   Judicial Admission

Plaintiff asserts in its post-trial submission, received on January 18, 2000, that the court is precluded from finding that the agreement is one of indefinite duration, and therefore terminable at will, because defendants admitted that the agreement was a two-year contract. (Post-Trial Sub. of Pl. M.T. Packaging, Inc. at 2-3.) Specifically, plaintiff states that defendants "embraced the argument that [the agreement between MTP and Big B] was a two-year contract . . . and should not be allowed at a later date to adopt [the position that the agreement was

---

[19] The court notes that § 7-2-309(3) provides that "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party. . . ." Ala. Code § 7-2-309(3) (1975). However, because the court finds that defendants are entitled to rescind the contract as a result of plaintiff's fraudulent suppression and misrepresentation, (see part II A(4) of this opinion), the court finds the issue of reasonable notification irrelevant.

19

terminable at will] because it serves their self-interest." (*Id.*) The statements to which plaintiff

refers include: (1) "The alleged contract at issue in this case is a two-year contract for the

purchase of bags . . . ," (Def.'s Mot. for Part. Summ. J., filed August 28, 1998, at 2 ¶ 2); (2) "The

alleged contract at issue in this case, a two-year bag purchase contract, . . . ," (Def.'s Mem. of

Law in Supp. of Mot. for Part. Summ. J. at 3 ¶ 1); (3) "MTP seeks to recover damages for

inventory stocked by MTP and lost profits for the two-year period of the agreement," (Def.'s

Trial Br. at 1); and (4) "There is no real dispute that the agreement was for a two-year period,"

(Def.'s Trial Br. at 17). The court disagrees with plaintiff's assertion.

First, the court notes that Federal Rule of Civil Procedure 8(e)(2) expressly permits

litigants to plead alternative defenses, even inconsistent ones. This rule provides:

> A party may set forth two or more statements of a claim or defense alternately or
> hypothetically, either in one count or defense or in separate counts or defenses.
> When two or more statements are made in the alternative and one of them if made
> independently would be sufficient, the pleading is not made insufficient by the
> insufficiency of one or more of the alternative statements. *A party may also state
> as many separate claims or defenses as the party has regardless of consistency*
> and whether based on legal, equitable, or maritime grounds. All statements shall
> be made subject to the obligations set forth in Rule 11.

Fed. R. Civ. P. 8(e)(2) (emphasis added). Defendants expressly stated in their Reply Brief in

Support of Motion for Partial Summary Judgment, received on October 1, 1998: "So that the

Court not rely on plaintiff's paraphrasing of defendants' contentions, it is worth noting that

defendants contend that there was no contract, that any agreement between the parties was

terminable at will, but if the Court finds that a nonterminable contract does exist, such a contract

is rendered void by the Statute of Frauds." (Reply Br. in Supp. of Mot. for Part. Summ. J. at 4 n.

1.) Alternative and inconsistent defenses may be raised in the pleadings, and such defenses may

be considered by the trier of fact if sufficiently supported by the evidence. *See Brownlow v.*

20

*Aman,* 740 F.2d 1476, 1491 (10th Cir. 1984). Because a party may state as many separate

defenses as the party has regardless of consistency and because there is sufficient evidence to

support the finding that the contract was one of indefinite duration, the court concludes that it

was permissible for defendants to argue both defenses.

Second, the court does not believe that the statements cited in support of plaintiff's

position constitute judicial admissions which would preclude a finding that the contract was one

of indefinite duration and mandate a finding that the contract was of a two-year duration.

Judicial admissions are statements that "bind the party making them and that withdraw a fact

from contention." *Taylor v. Monsanto Co.,* 150 F.3d 806, 809 (7th Cir. 1998). Statements of

fact contained in a brief may be considered admissions of the party in the discretion of the

district court. *See First National Bank of Alexander City v. Avondale Mills Bevelle Employees*

*Federal Credit Union,* 967 F.2d 556, 560 (11th Cir. 1992) (citing *American Title Ins. Co. v.*

*Lacelaw Corp.,* 861 F.2d 224, 227 (9th Cir. 1988)). As noted by the Eleventh Circuit:

> [J]udicial admissions are proof possessing the highest possible probative value.
> Indeed, facts judicially admitted are facts established not only beyond the need of
> evidence to prove them, but beyond the power of evidence to controvert them.

*Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir.

1983) (citation and quotations omitted). If there is doubt as to whether the statement amounts to

a judicial admission, the doubt must be resolved in favor of the party making the statement, and

the factual dispute must be submitted to the factfinder for resolution. *See Oscanyan v. Arms Co.,*

103 U.S. 261, 263 (1880) ("If a doubt exists as to the statement of counsel, the court will

withhold its directions, as where the evidence is conflicting, and leave the matter to the

determination of the jury.").

The statements referenced in plaintiff's brief are not clear, deliberate, and unambiguous

concessions of an alleged fact. *See, e.g., Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 127 F.3d 122,

134 (1st Cir. 1997). As noted above, defendants have continued to argue that any contract

between the parties was a requirements contract and that any contract was terminable at will;

however, they alternatively argued that if there was a two-year contract, it was barred by the

statute of frauds.[20] After reviewing the record as well as the trial transcript, the court concludes

that defendants have not admitted facts sufficient to establish an unconditional assent to a

contract for a definite two-year duration.

### c. Judicial Estoppel

To the extent that plaintiff's argument is grounded on the theory of judicial estoppel as

opposed to judicial admission, the court concludes that such an argument is also without merit.

In diversity cases such as this one, "the application of the doctrine of judicial estoppel is

governed by state law." *Original Appalachian Artworks, Inc. v. S. Diamond Associates, Inc.,* 44

F.3d 925, 930 (11th Cir. 1995). Under Alabama law, the doctrine of judicial estoppel applies to

---

[20] Defendants' Answer repeatedly stated that defendants "expressly deny that Big B entered into any contractual arrangement with plaintiff obligating Big B to purchase bags on an ongoing basis, or to purchase bags at all." (Answer at ¶¶ 8-11, 13.) As noted above, defendants stated in their Reply Brief in Support of Motion for Partial Summary Judgment, submitted on October 1, 1998: "So that the Court not rely on plaintiff's paraphrasing of defendants' contentions, it is worth noting that defendants contend that there was no contract, that any agreement between the parties was terminable at will, but if the Court finds that a nonterminable contract does exist, such a contract is rendered void by the Statute of Frauds." (Reply Br. in Supp. of Mot. for Part. Summ. J. at 4 n. 1.) Additionally, the Pretrial Order does not list as an "undisputed fact" that the agreement was for a duration of two years. Rather, the Pretrial Order contains as contested issues of law: "Whether the termination of the 1996 Agreement was in derogation of defendants' obligations under the Agreement" and "Whether the 1995 and 1996 Agreements were requirements contracts." (Pretrial Order at p. 3(5)c, p. 4 ¶ (5)d.) Further, defendants claim, *inter alia*, that plaintiff's breach of contract claim fails because "if the 1996 letter agreement is found to be a requirements contract, it was terminated in good faith because of a cessation in requirements for Big B bags." (Pretrial Order at 8 ¶ (5)f.)

22

circumstances in which a party seeks to take a position inconsistent with a position that party has taken in a *prior* action. *See Jinright v. Paulk,* 2000 WL 92252, *2 (Ala. Jan. 28, 2000); *Porter v. Jolly,* 564 So.2d 434, 437 (Ala. 1990). The doctrine of judicial estoppel requires a showing that "the party against whom the estoppel is sought to be imposed *actually procured a judgment in his favor* as a result of the inconsistent position taken by him in the prior proceeding." *Porter,* 564 So.2d at 437 (emphasis added). No such judgment was procured in a prior proceeding. Thus, the court concludes that the doctrine of judicial estoppel is not applicable to this case.

d. Equitable Estoppel

Defendants are also not equitably estopped from asserting that the agreement is of indefinite duration and therefore terminable at will. Equitable estoppel is a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled, or pleading or proving an otherwise important fact. *State ex rel. Atty. Gen. v. Ward,* 133 So.2d 383, 389 (Ala. 1961). As stated by the Alabama Supreme Court:

> The purpose of the doctrine of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience.

*Robinson v. Boohaker, Schillaci & Co.,* No. 1972152, 2000 WL 283880, at *2 (Ala. March 17, 2000) (citation and quotation marks omitted). Thus, "a party who, for the purpose of maintaining a cause or defense, has deliberately represented a fact or claim in one aspect, cannot be permitted to contradict his own representation by giving the same thing another aspect." *Bracy v. Scott,* 589 So.2d 145, 146 (Ala. 1991). In order to establish the essential elements of equitable estoppel, plaintiff must demonstrate:

23

(1) That the person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct or silence, with the intention that the communication will be acted on;

(2) That the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon the communication; and

(3) That the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct.

*Lambert v. Mail Handlers Benefit Plan,* 682 So.2d 61, 64 (Ala. 1996) (citation and quotation marks omitted). Additionally, "[a] party invoking estoppel must have in good faith been ignorant of the true facts at the time a representation was made to him, and must have acted with diligence to learn the truth." *Id.* (citation and quotation omitted).

Nothing in the record supports the conclusion that Big B's conduct or representations rendered the assertion of their rights contrary to equity and good conscience. Additionally, plaintiff was not ignorant of the facts regarding the duration of the contract. Thus, the court concludes that the doctrine of equitable estoppel is not applicable to this case.

## 2. Requirements Contract

The court concludes that the September 1996 agreement between MTP and Big B was also a requirements contract. Alabama Code § 7-2-306(1) (1975) provides:

A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable output or requirements may be tendered or demanded.

This section "requires the reading of commercial background and intent into the language of [the] agreement and demands good faith in the performance of that agreement," where the quantity term is based on the requirements of the buyer. *See* Official Comment to Ala. Code § 7-2-306 (1975). Further:

24

> The essential test is whether the party is acting in good faith. . . . If an estimate of
> output or requirements is included in the agreement, no quantity unreasonably
> disproportionate to it may be tendered or demanded. Any minimum or maximum
> set by the agreement shows a clear limit on the intended elasticity.

*Id.* Additionally, Alabama Code § 7-2-309(2) (1975) provides: "Where the contract provides for

successive performances but is indefinite in duration it is valid for a reasonable time but unless

otherwise agreed may be terminated at any time by either party." The comment to § 7-2-306

further provides that the sale of an enterprise is not grounds for sudden expansion or decrease.

*See* Official Comment to Ala. Code § 7-2-306 (1975). Therefore, the court finds that, had

plaintiff not committed fraud, thereby entitling defendants to rescind the contract,[21] defendants

would be liable for the amount of inventory produced in good faith by plaintiff, based on Big B's

requirements.

### 3. Statute of Frauds

At trial, defendants argued that the 1996 contract was void under the statute of frauds,

Alabama Code § 8-9-2(1) (1975), which controls contracts not to be performed within one year.

Defendants alleged that Campbell, as Big B's agent, did not have authority in writing to execute

the contract.[22] Based on the court's conclusion that the contract was terminable at will[23] and

thus, could be performed within one year, the court concludes that the statute of frauds found in

---

[21] *See* Part II A(4) and Part II C(1) and (2) of this opinion.

[22] Defendants first contended that there was no contract, or that any agreement between
the parties was terminable at will. However, if the court determined that a nonterminable
contract did exist, defendants argued that such a contract was rendered void by the statute of
frauds. (Reply Br. In Supp. of Mot. for Partial Summ. J. at 4, n. 1.) Additionally, as stated in the
pretrial order, the parties contested whether the 1995 and 1996 agreements were requirements
contracts and whether the termination of the 1996 agreement was in derogation of defendants'
obligations under the agreement. (Pretrial Order at p. 4 ¶ (5)d.)

[23] *See, infra,* Part II A(1)(a) of this opinion.

25

Alabama's version of the Uniform Commercial Code, § 7-2-201, controls the facts of this case

and the general statute of frauds, § 8-9-2(1), is not applicable.[24]

a.   Alabama Code § 7-2-201

As noted above, because the agreement in issue is a contract for the sale of goods, the

UCC governs this case.

---

[24]  In the event that both § 8-9-2(1) and § 7-2-201(2) are applicable to the facts of this
case, the court notes that there is a split in authority as to whether § 7-2-201 supplants or
supplements § 8-9-2. This court agrees with the view that the Uniform Commercial Code statute
of frauds supersedes the general statute of frauds regarding agreements not to be performed
within one year. *See, e.g., Rosenfeld v. Basquiat,* 78 F.3d 84, 93 (2nd Cir. 1996); *H & W
Industries, Inc. v. Formosa Plastics Corp.,* 860 F.2d 172, 179-80 (5th Cir. 1988); *Roth Steel
Products v. Sharon Steel Corp.,* 705 F.2d 134, 140-41 (6th Cir. 1983); *AP Propane, Inc. v.
Sperbeck,* 555 N.Y.S.2d 211, 212-13 (App. Div. 1990), *aff'd,* 571 N.E.2d 78 (N.Y. 1991). The
Official Comment to § 7-2-201 acknowledges that the legislature's intent in enacting the
Commercial Code statute of frauds provision was to liberalize the requirements of the writing.
*See Port City Const. Co., Inc. v. Henderson,* 266 So.2d 896, 900 (Ala. Civ. App. 1972). If both
statutes of fraud were applicable, the legislature's intent would not be fulfilled.

However, Alabama law appears to hold that a contract falling within the scope of both
the UCC statute of frauds and the general statute of frauds provisions must satisfy both statutes
in order to be enforceable. *See Riley v. Capital Airlines, Inc.,* 185 F.Supp. 165, 170 (S.D. Ala.
1960) ("Both of these sections were devised for the prevention of fraud in contracts. It would be
a fallacy to hold that one section permitted the enforcement of a contract, and at the same time
find the identical contract to be unenforceable under another section of the Code. . . . *The Court
therefore concludes as a matter of law that both sections of the Alabama Code are applicable to
the contract here in issue* . . . ."); *Bussey v. John Deere Co.,* 531 So.2d 860, 863 (Ala. 1988) (In
upholding the trial court's granting of summary judgment, the court analyzed the writing under
both statute of fraud provisions as though each provided a separate defense); *Fendley v. Dozier
Hardware Co.,* 449 So.2d 1236 (Ala. 1984) (In concluding that both statute of frauds defenses
under § 8-9-2 and § 7-2-201 presented jury questions, the court analyzed each section as though
each was an independent defense requiring the plaintiff to prove that the requirements of both
sections were satisfied.); *Engel Mortgage Co. v. Triple K Lumber Co.,* 321 So.2d 679, 683 (Ala.
Civ. App. 1975) (Both the UCC statute of frauds and the general statute of frauds provisions
"provide affirmative defenses which fit into the generic category of statute of frauds, they
provide distinctly different grounds of defense. They are not concurrent, even though in a
limit[ed] number of fact situations both might apply."). Thus, the court will address both statute
of fraud provisions.

26

The UCC statute of frauds provides:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . .
> (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.
> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable:
> (a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement;
> . . .

Ala. Code § 7-2-201 (1975).

The court concludes that the 1996 contract at issue falls under the UCC statute of frauds, and the contract meets the requirements of Ala. Code § 7-2-201(1). As noted above, the contract consists of a letter from Elefant, on behalf of MTP, to Campbell, on behalf of Big B, providing for the sale of merchandise bags. (*Id.*). (PX 20.) Both parties signed the contract. (*Id.*) The agreement involved the sale of specially manufactured bags worth over a million dollars per year. (PX 17; *see also* Tr. at 551.) Thus, the letter signed by Elefant on September 3, 1996, and signed by Campbell on September 10, 1996, satisfies the requirements of § 7-2-201(1).

Additionally, the contract meets the requirements of § 7-2-201(2). The "merchant exception" to the UCC statute of frauds provides that, as between merchants, a confirmatory writing sent to a buyer satisfies the "writing" requirement of subsection (1), unless an objection in writing is given within 10 days. *See Burbic Contracting Co., Inc. v. Cement Asbestos*

27

*Products Co.,* 409 So.2d 1, 4 (Ala. 1982) ("Section 7-2-201 of Alabama's version of the

Uniform Commercial Code permits a written confirmatory memorandum to satisfy the

requirement of the statute of frauds."). The UCC contains the following definition of

"merchant:"

> a person who deals in goods of the kind or otherwise by his occupation holds
> himself out as having knowledge or skill peculiar to the practices or goods
> involved in the transaction or to whom such knowledge or skill may be attributed
> by his employment of an agent or broker or other intermediary who by his
> occupation holds himself out as having such knowledge or skill.

Ala. Code § 7-2-104 (1975). "Between merchants" means in any transaction with respect to

which both parties are chargeable with the knowledge or skill of merchants. Ala. Code § 7-2-

104(3) (1975). The Official Comment to § 7-2-104 further provides:

> This Article assumes that transactions between professionals in a given field
> require special and clear rules which may not apply to a casual or inexperienced
> seller or buyer. . . . The professional status under the definition may be based
> upon specialized knowledge as to the goods, specialized knowledge as to business
> practices, or specialized knowledge as to both and which kind of specialized
> knowledge may be sufficient to establish the merchant status is indicated by the
> nature of the provisions.

Official Comment to Ala. Code § 7-2-104 (1975). All parties to the contract at issue are

merchants. Further, Elefant sent Campbell a confirmatory letter establishing the terms of the

agreement between plaintiff and Big B. (PX 20.) Because no Big B agent objected in writing to

the letter agreement dated September 3, 1996, within 10 days, the confirmatory letter satisfies

the writing requirement of the UCC statute of frauds.

Finally, the contract in issue also meets the requirements of § 7-2-201(3)(a), inasmuch as

the subject of the contract constitutes specially manufactured goods not suitable for sale to others

in the ordinary course of the seller's business. *See Smith-Scharff Paper Co. v. P.N. Hirsch &*

*Co. Stores, Inc.,* 754 S.W.2d 928, 930 (Mo. Ct. App. 1988) (finding that bags made specially for

and stamped with the customer's name were not suitable for sale to others in the ordinary course of business and consequently no written contract for the transaction was required under the statute of frauds). A contract is exempt from the requirements of the statute of frauds if it falls under the specially manufactured goods section. Therefore, the contract for the Big B-inscribed merchandise bags does not require a written agreement under the statute of frauds. *See id.*

### b.   Alabama Code § 8-9-2(1)

Defendants contended at trial that the 1996 contract, signed by Campbell and Elefant, was void under Alabama Code § 8-9-2(1) because Campbell was not lawfully authorized in writing to bind Big B to such contract. Alabama Code § 8-9-2(1) provides:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
> (1) Every agreement which, by its terms, is not to be performed within one year from the making thereof; . . .

However, the court concludes that § 8-9-2(1) is not applicable to the facts in the present case because the contract in issue is capable of being performed within one year.[25]

In order to bring a contract within the scope of § 8-9-2(1), the contract must be incapable of being performed within one year. *Stephens v. Stephens,* 680 So.2d 329, 333 (Ala. Civ. App. 1996). "In order to bring a particular oral contract within the influence of this clause of the statute, there must be a negation of the right or possibility to perform it within a year, that is, by its terms it is not to be or is incapable of being so performed." *Land v. Cooper,* 34 So.2d 313,

---

[25] *See,* Part II A(1)(a) of this opinion, in which the court concludes that the contract is terminable at will.

316 (Ala. 1948).[26]  The court in *Land* further noted:

> In *Brown & Sons Lumber Co. v. Rattray*, . . . this court approved the statement .
> . . that to bring a contract within the operation of this clause of the statute there
> must be an express and specific agreement that it is not to be performed within
> the space of a year; if the thing may be performed within the year, it is not within
> the statute, a restricted construction being given to the statute on account of the
> negative form of the provision.  A contract is not brought within the statute by the
> fact that the full performance within a year is highly improbable, nor by the fact
> that the parties may not have expected that the contract would be performed
> within the year.  This is said to be true if there is a possibility of its being
> performed within a year, and there is no stipulation that it shall not be so
> performed.
>
> We also observe the following statement pertinent to the facts here alleged in 37
> C.J.S., Frauds, Statute of, § 48: Although by the terms of an oral agreement for a
> period in excess of a year may be allowed for its performance, yet if on the
> happening of a certain stipulated event which may happen within a year it can be
> completely performed consistently with the rights and understanding of the
> parties thereto, it will not be regarded as within the statute.

*Id.* at 316-317 (internal quotation and citations omitted).  Thus, "[i]f a condition terminating a

contract may occur within one year, . . . the contract is performable within one year, even though

performance may in fact extend beyond that period." *Kitsos v. Mobile Gas Service Corp.,* 404

So.2d 40, 42 (Ala. 1981).  In order for the contract in issue to fall outside § 8-9-2(1), there must

be a reasonable possibility, both under the circumstances and within the intentions of the parties,

of performance within a year. *See Dean v. Myers,* 466 So.2d 952, 954-55 (Ala. 1985).

The court is of the opinion that the contract in issue was terminable at will,[27] and, thus,

under such terms there is a reasonable possibility of performance within one year of its making.

Therefore, the court concludes that the contract is outside the general statute of frauds, Alabama

---

[26]  Although the case at bar does not include an oral contract, the statute also applies to a
written contract which allegedly fails to meet the writing requirements.

[27]  *See* Part II A(1)(a) of this opinion.

30

Code 1975, § 8-9-2-(1). *See Abbott III v. Hurst,* 643 So.2d 589, 592 (Ala. 1994) ("a contract

establishing a partnership terminable at the will of any partner is generally held to be capable of

performance by its terms within one year of its making and, therefore, to be outside the Statute

of Frauds").

Assuming arguendo that § 8-9-2(1) is applicable and the contract was not to be

performed within one year of its making, the court concludes that § 8-9-2(1) does not render the

contract in issue void. In making this determination, the court must ascertain whether Campbell

was "lawfully authorized in writing" to enter into the contract on behalf of Big B. Ala. Code §

8-9-2(1) (1975). The court must also determine whether Campbell's written authorization itself

satisfies the statute of frauds. *See e.g., Durham v. Harbin,* 530 So.2d 208, 211 (Ala. 1988);

*Paris v. Johnston,* 46 So. 642, 643-44 (1908).

### i. *Written Authorization*

The general statute of frauds requires that the authorization for an agent to enter into a

contract falling within the statute must also be in writing. As stated by the Alabama Supreme

Court:

> Alabama law is well settled on the principle that in order for an agent to act on a
> principal's behalf regarding a matter controlled by the Statute of Frauds, the
> agent's authority must be in writing. Moreover, any contract made by an agent
> without written authority is void if the contract itself is one that has to be in
> writing.

*Hight v. Byars,* 569 So.2d 387, 388 (Ala. 1990) (citations omitted). At trial, no such document

was produced and there was contradictory testimony as to whether such document existed at

all.[28] The court finds credible the testimony of Vincent Bruno ("Bruno"), a Senior Vice

---

[28] Pursuant to the merger between Revco and Big B, all files and records were left intact
for Revco's use. (Tr. at 23.) However, few documents pertaining to Big B exist following the

President and supervisor of all buyers in the Purchasing Department at Big B, including Whaley

and Campbell. (Tr. at 11-12.) Bruno testified that during the time in which he held this position,

he possessed written job descriptions applicable to buyers in the Purchasing Department. (Tr. at

14-17, 23.) Bruno kept these job descriptions in his desk file. (Tr. at 23.) However, these files

were left for Revco when Revco merged with Big B, and Bruno does not know what happened to

those files after he left Big B. (Tr. at 23-24.)

Bruno further testified that these descriptions had been prepared by him for each position

in the Purchasing Department at Big B, and that these job descriptions would have allowed

Whaley and Campbell to enter into the agreement with MTP "if it meant signing the contract to

do business in a professional manner."[29] (Tr. at 19-20; *see also* Tr. at 37.) These job

descriptions did not have the specific employee's name, but instead were general job

descriptions for buyers of supplies. (Tr. at 27-28.) Thus, Campbell's job description would have

been the same as Whaley's. (Tr. at 16.) Bruno testified that under the written job descriptions,

Whaley and Campbell would have had the authority to enter into the type of agreement at issue

in this case. (Tr. at 35-36.) This is consistent with Whaley's recollection also. (Tr. at 640-47.)

Tow, who was the Director of Purchasing at Big B from May of 1994, through December of

---

successive mergers of Big B and Revco, and Revco and CVS. (PX 30 (Def.'s Ans. to Pl.'s Third
Interrog. to Def. #2).) Many documents created by Big B would have been discarded or
destroyed as a result of the corporate acquisition process. (*Id.*) Mark Horning, the CVS
corporate representative who testified at trial, stated that he had no knowledge regarding the
disposition of the business records of Big B once Revco and then CVS took over. (Tr. at 685.)
However, all documents required by law to be retained were so retained. (PX 30, Def.'s Ans. to
Pl.'s Third Interrog. to Def #2.)

[29] The job descriptions did not state whether the buyers had to get approval before
signing such agreement. (Tr. at 21.) However, Bruno testified that the buyers usually did get
permission to sign the agreements and he would have expected buyers such as Whaley to come
to him before signing the agreement. (Tr. at 20-21.)

1997, also testified that Whaley and Campbell were authorized to enter into the agreement with Big B. (Tr. at 657, 667-68.)

Bruno also stated that he would "authorize the buyers from time to time to enter into agreements with the manufacturers to do whatever is necessary to conduct the manner of business which was in the best interest of Big B." (Tr. at 14.) Bruno further testified that he authorized Whaley to sign the 1995 agreement, and he expects he would have authorized Campbell to sign the 1996 agreement. (Tr. at 22-23.) Thus, based on the testimony of Bruno, the court is of the opinion that Campbell was "legally authorized in writing" to enter into the 1996 contract.

The conduct and apparent intent of the parties also indicates that Campbell had authority to enter into the agreement in issue.[30] Because this writing pertains to a transaction in goods, Article 2 of the Uniform Commercial Code ("UCC") is applicable. An analysis of the parties' course of dealing, governed by Alabama Code § 7-1-205, usage of trade, governed by Alabama Code § 7-1-205, and course of performance, governed by Alabama Code § 7-2-208, demonstrates that Campbell had authority to bind Big B to the contract in issue.

"A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Ala. Code § 7-1-205(1) (1975). "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the

---

[30] If, upon the face of an instrument, an ambiguity exists, i.e., it is subject to more than one interpretation, the court may look to the intent of the parties by considering the contract as a whole as well as the circumstances surrounding the agreement. *See Hester v. Miller,* 364 So.2d 1146, 1149 (Ala. 1978.)

transaction in question." Ala. Code § 7-1-205(2) (1975). "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning or the agreement." Ala. Code § 7-2-208(1) (1975).

"A course of dealing between the parties and any usage of trade . . . give particular meaning to and supplement or qualify terms of an agreement." Ala. Code § 7-1-205(3) (1975). "The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance, and course of performance shall control both course of dealing and usage of trade (Section 7-1-205)." Ala. Code § 7-2-208(2) (1975).

The court is of the opinion that the course of performance, usage of trade, and course of dealing indicate that Campbell had sufficient authority to bind Big B in this particular contract. Whaley and Elefant entered into the 1995 agreement, and Big B purchased bags under this agreement for approximately 17 months with no complaints or problems. (Tr. at 119, 606-07, 615, 626; PX 7.) Campbell and Elefant then entered into the 1996 agreement. (PX 20.) Both Whaley and Campbell, as well as other buyers for Big B, entered into these types of agreements for numerous other products, as well. (Tr. at 550, 585.) In conjunction with their responsibilities, buyers for Big B repeatedly executed purchase orders. (Tr. at 545-46, 575.) Additionally, Elefant entered into contracts to supply bags to other retail stores. (Tr. at 42-44.) These facts indicate that buyers such as Campbell were authorized to enter into agreements of the type at issue in this case. The court is of the opinion that Campbell was authorized in writing

34

to enter into contracts on behalf of Big B.

### ii.    *Sufficient Authorization*

The next issue, then, is whether the written job description was sufficient to satisfy the general statute of frauds. Although no document was produced at trial, based upon policy considerations, the court concludes that the writing authorizing Campbell to enter into agreements on behalf of Big B was sufficient. If this contract was voided, every contract Campbell and other buyers entered into would likewise be void. In such a situation, every employee in the same or similar position as Campbell would be repeatedly conducting illegal business. The court cannot surmise that this is what the parties or the legislature would have intended. Thus, the court concludes that if § 8-9-2(1) was applicable and this was a contract not to be performed within one year, Campbell was lawfully authorized in writing to bind Big B to the type of contract at issue in this case. Therefore, the contract between MTP and Big B is not voided under the general statute of frauds, Ala. Code § 8-9-2(1) (1975).

### c.    Conclusion

The court concludes that the contract is governed by the UCC statute of frauds, and, as such, meets the requirements under §§ 7-2-201(1), (2), and (3)(a). The court further concludes that the general statute of frauds, § 8-9-2(1), is not applicable to the facts of this case. However, in the event that this section is applicable, the court concludes that the contract in issue meets the requirements of § 8-9-2(1). Thus, the contract is not void under the statute of frauds.

### 4.    *Rescission*

Under Alabama law, a "material false statement, relied upon by the other party in ignorance of its falsity, and which materially influences him to enter into the contract, constitutes a fraud which will authorize a recission." *Stone v. Walker,* 77 So. 554, 557 (Ala. 1917); *accord*

35

*Hillcrest Center, Inc. v. Rone,* 711 So.2d 901, 906-07 (Ala. 1997); *Brabner v. Canton,* 611 So.2d

1016, 1018 (Ala. 1992).[31]  A material breach of contract may do likewise.  *Johnson v.*

*Jagermoore-Estes Properties,* 456 So.2d 1072, 1075 (Ala. 1984).  Further, when one has been

induced to enter into a contract through material misrepresentations, such an individual may

defeat or mitigate recovery when sued thereon by pleading and showing the fraud and the

damage resulting therefrom.  *Lowery v. Mutual Loan Soc., Inc.,* 79 So. 389, 391 (Ala. 1918).

"The right to a rescission on account of fraud does not depend upon . . . the inadequacy of an

action at law for damages."  *Stone,* 77 So. at 557; *accord Sheffield v. Andrews,* 679 So.2d 1052,

1053 (Ala. 1996) (determining that plaintiff could collect damages for fraud and rescind the real

estate conveyance, and that such remedies were not inconsistent); *Mid-State Homes, Inc. v.*

*Johnson,* 311 So.2d 312, 318 (Ala. 1975) ("where one rescinds a contract induced by fraud and

recovers even nominal damages, then in an appropriate case he may also recover punitive

damages").

    "A party is under no duty to seek rescission until he knows both of the existence of the

fraud and the full injurious effect thereof."  *Putnam Construction & Realty Co., Inc. v. Byrd,* 632

So.2d 961, 965 (Ala. 1992) (citing *Stafford v. Colonial Mortgage & Bond Co.,* 130 So. 383 (Ala.

1930).  Counter-claimants did not learn of the existence of MTP's fraud until after MTP filed

---

[31]  This rule of law is also reflected in the Alabama Pattern Jury Instructions, approved
for use by the Alabama Supreme Court.  *See* "Order of the Supreme Court of Alabama
Approving Use of Alabama Pattern Jury Instructions," Alabama Pattern Jury Instructions (Civil)
(2d ed. 1993) at pp. xix-xxii; *see also Kuenzel v. State,* 577 So.2d 474, 520 (Ala. Crim. App.
1990).  Pattern Jury Instruction 10.15 provides that a willful misrepresentation as defined by
Pattern Jury Instruction 18.01 "will invalidate a contract and relieve one from performance."
Pattern Jury Instruction 18.01 provides that one is guilty of legal fraud if he or she "willfully
misrepresented a material fact to the plaintiff with the intent to induce plaintiff to act thereon and
plaintiff did, without knowledge of its falsity, act upon said willful misrepresentation to his
injury."

suit against them for breach of contract and discovery had begun. (Def.'s Verified Mot. to Amend Ans., filed May 5, 1998, ¶ 1.) The Pretrial Order included as a contested issue of law: "Whether the 1996 Agreement is void or voidable on the ground of fraud." (Pretrial Order at p. 4 ¶(5)d.) For the reasons stated below, the court concludes that defendants are entitled to a rescission of the 1996 contract.

The court concludes that Big B was materially influenced to enter into the September 1996 agreement as a result of material false statements made by Elefant.[32] Campbell testified that the reason he agreed to the price increase was because Elefant stated that MTP's costs were going to increase as a result of a rise in the cost of resin. (Tr. at 518, 522.) Campbell also stated that his understanding was that MTP's cost increase was going to be greater than the cost increase to Big B. (Tr. at 519.) Campbell testified that if he had known that MTP's prices had not increased at any time prior to 1996 and that MTP's prices were only going to increase by five percent, he would not have agreed to the price increase. (Tr. at 522-25.) Elefant admitted during his testimony that the fifteen percent price increase he proposed to Campbell far exceeded the price increase that PCL proposed to MTP. (Tr. at 411.) Elefant also admitted that these representations were made to Campbell with the intention of getting Big B to agree to the price increase. (Tr. at 412.) Thus, the court is of the opinion that Elefant's misrepresentation of MTP's costs as the basis for the price increase was made to induce Big B to enter into the 1996 agreement. Further, in making the decision to enter into the 1996 agreement, Campbell relied on Elefant's representations to the injury of Big B. Thus, defendants are entitled to a rescission of the 1996 contract.

---

[32] For an extended discussion of plaintiff's fraudulent misrepresentations, *see* part C of this opinion.

37

**B.    Plaintiff's Remaining Claims**

### *1.    Breach of Implied Covenant of Good Faith and Fair Dealing*

Plaintiff also asserted a claim for breach of the implied covenant of good faith and fair

dealing in the Complaint as well as the Amended Complaint. (Complaint ¶¶ at 17-19; Amended

Complaint at ¶¶ 17-19.) Defendants asserted in their answer to plaintiff's Amended Complaint

that such a claim is barred by the Alabama Supreme Court's decision in *Kennedy Elec. Co. v.

Moore-Handley, Inc.,* 437 So.2d 76 (Ala. 1983). (Answer at 5.) This claim was still listed as a

contested issue of law in the Pretrial Order. (Pretrial Order at 4 ¶ (5)d.) However, the court

agrees with defendants' contention. In *Kennedy Electric,* the Alabama Supreme Court stated:

> Although every contract does imply good faith and fair dealing (see § 7-1-203,
> Code 1975), it does not carry with it the duty imposed by law which we have
> found in the context of insurance cases. We are not prepared to extend the tort of
> bad faith beyond the area of insurance policy cases at this time.

*Kennedy Electric,* 437 So.2d at 81. Thus, *Kennedy Electric* precludes any assertion that

plaintiff's bad faith claim can be pursued as a tort claim. *See Lake Martin / Alabama Power

Licensee Assoc., Inc. v. Alabama Power Co., Inc.,* 601 So.2d 942, 944 (Ala. 1992) ("Any

suggestion that the plaintiff's bad faith claim can be pursued as a tort claim under the facts of

this case, seems to have been settled in *Kennedy Electric Co. v. Moore-Handley, Inc.*, 437 So.2d

76, 81 (Ala. 1983), wherein this court stated, "We are not prepared to extend the tort of bad faith

beyond the area of insurance policy cases.") (citations and quotation marks omitted).

Additionally, as the court has previously found that defendants did not breach a specific term of

the contract, plaintiff's bad faith claim is also not viable under contract law. *See id.* ("In the

cases relied upon by the plaintiffs, this Court did not recognize a bad faith claim under contract

law absent a breach of a specific term of the contract.") Therefore, the court finds in favor of

38

defendants as to plaintiff's claim for breach of the implied covenant of good faith and fair

dealing.

### 2. *Promissory Estoppel*

Plaintiff further asserted in the Complaint and Amended Complaint:

> Based upon the previous contracts, past practices of the parties and previous
> orders placed by Big B, M.T. Packaging detrimentally relied upon Big B's
> promise to purchase a certain number of personalized plastic bags. . . . As a result
> of this detrimental reliance, Big B was estopped from terminating the contract
> with M.T. Packaging prior to the termination as set forth in the contract.

(Complaint at ¶¶ 21-22; Amended Complaint at ¶¶ 21-22.)  The court concludes that the

principle of promissory estoppel does not create a binding contract between MTP and

defendants.

The Alabama Supreme Court has adopted the following definition of promissory estoppel

from the Restatement (First) of the Law of Contracts, § 90:

> A promise which the promisor should reasonably expect to induce action or
> forbearance of a definite and substantial character on the part of the promisee and
> which does induce such action or forbearance is binding if injustice can be
> avoided only by enforcement of the promise.

*See, e.g., Ford v. Jackson Square, Ltd.,* 548 So.2d 1007, 1013 (Ala. 1989).  Another well-settled

principle is that "estoppels . . . are protective only, and are to be invoked as shields and not as

offensive weapons, and that their operation should be limited to saving harmless, or making

whole, the person in whose favor they arise, and they should never be the instruments of gain or

profit." *Merchants National Bank of Mobile v. Steiner,* 404 So.2d 14, 19 (Ala. 1981) (citations

omitted).  The Alabama Supreme Court has stated that "a mere refusal to perform a promised act

is insufficient evidence of such inherent fraud to allow equity's intervention." *Durham v.*

*Harbin,* 530 So.2d 208, 212 (Ala. 1988).  The court does not find that any actions which MTP

39

has taken are such that injustice can be avoided only by enforcement of Big B's alleged promise to purchase bags from MTP for two years.

The court has previously concluded that the contract at issue was terminable at will. No representations or promises were made by Big B regarding the term, duration, or length of the contract. Thus, the principle of promissory estoppel "cannot be utilized to create primary contractual liability where none would otherwise exist." *Bates v. Jim Walter Resources, Inc.,* 418 So.2d 903, 905 (Ala. 1982). Promissory estoppel requires "that the promise or representation of the party estopped be made with the intention, or at least the reasonable expectation, that it will be acted on by the other party." *Mazer v. Jackson Ins. Agency,* 340 So.2d 770, 774 (Ala. 1976). Big B made no assurances to MTP that they would continue to purchase bags for two years. Under the facts of this case, defendants are not estopped from denying the existence of a binding two-year contract.

## C.    Fraud Counterclaim

On May 11, 1998, defendants filed a Second Amended Answer, asserting a counterclaim for fraud. Defendants alleged that plaintiff "has engaged in a pattern and practice of misrepresentation and nondisclosure with regard to material facts relating to the sale of bags by plaintiff to defendant Big B." (Second Am. Ans. ¶ 1.) Based on the evidence presented at trial, the court is of the opinion that plaintiff defrauded Big B by secretly reducing the gauge of the merchandise bags and in attaining the September 1996 price increase.[33]

---

[33] The Pretrial Order listed as a contested issue of law: "Whether promissory estoppel bars defendants' counterclaims." (Pretrial Order at p. 4 ¶(5)d.) For the reasons articulated in Part C (2) of this Opinion, the court concludes that the theory of promissory estoppel does not bar defendants' counterclaim for fraudulent suppression and misrepresentation.

### 1.    *Gauge Reduction*

Suppression of a material fact which a party is under an obligation to communicate to the other party constitutes fraud. *Kaye v. Pawnee Construction Co., Inc.,* 680 F.2d 1360, 1370 (11th Cir. 1982) (citing Ala. Code § 6-5-102 (1975)).  The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.  *Id.* According to the Alabama Supreme Court, a fraudulent concealment is defined as:

> the failure to disclose a material fact, which the vendor knows himself, which he has a right to presume the person with whom he is dealing is ignorant of, and of the existence of which the other can not, by ordinary diligence, become acquainted.  Concealment implies design, or purpose.  That it may furnish a sufficient cause of action, the fact suppressed must not be only material, but the materiality must either be known to the seller, or the facts must so constitute an element of the value of the contract, as to authorize the inference of knowledge of its materiality.  The concealment must be for the purpose of continuing a false impression or delusion under which the purchaser has fallen, or of suppressing inquiry, and thereby effecting a sale - with the intention to conceal or suppress - and it must operate [as] an inducement to the contract.

*Marshall v. Crocker,* 387 So.2d 176, 179 (Ala. 1980) (quoting *Steele v. Kinkle & Lehr,* 3 Ala. 352 (1842)) (quotation marks omitted).  Thus, in order to prevail on their suppression claim, defendants must produce substantial evidence establishing: (1) a duty to disclose the facts, (2) concealment or nondisclosure of material facts by the counter-defendant, (3) inducement of the counter-claimant to act, and (4) action by the counter-claimant to his injury.  *Mutual Sav. Life Ins. Co. v. James River Corp. of Va.,* 716 So.2d 1172, 1179 (Ala. 1998).

### a.    *Duty to Disclose*

"It is well established that a party's mere silence as to a material fact does not constitute fraud unless that party is under a duty to disclose that fact." *State Farm & Casualty Co. v. Owen,* 729 So.2d 834, 837 (Ala. 1998).  Further, the existence of a duty to disclose is a question of law to be determined by the trial judge.  *Id.* at 839.  Under § 6-5-102 of the Alabama Code,

there are two situations in which a duty to disclose may arise: (1) when there is a confidential
relationship between the parties, or (2) when warranted by the particular circumstances of the
case. *See, e.g., Barnett v. Funding Plus of America, Inc.,* 740 So.2d 1069, 1074 (Ala. 1999).
The parties in this case do not have a confidential relationship as defined by the Alabama
Supreme Court in *Holdbrooks v. Central Bank of Alabama, N.A.,* 435 So.2d 1250, 1252 (Ala.
1983).  However, the court concludes that under the particular facts of this case, plaintiff was
under a duty to disclose the reduction in the gauges of the bags.

In determining whether the particular circumstances of the case create a duty to disclose,
certain factors must be considered: "(1) the relationship of the parties; (2) the relative knowledge
of the parties; (3) the value of the particular fact; (4) the [counter-claimant's] opportunity to
ascertain the fact; (5) customs of the trade; and (6) other relevant circumstances." *State Farm
Fire & Casualty Co. v. Slade,* 747 So.2d 293, 324 (Ala. 1999).

After examining these factors and the facts of this case, the court concludes that MTP
had a duty to disclose the reduction in the gauge of the bags.  Elefant and Whaley had
previously reached an agreement regarding the characteristics of the bags, including the gauge.
(Tr. at 54-55, 265, 275, 581-85.)  Elefant testified that the gauge was an important part of the
contract and that he knew that any changes in the construction of the bags had to be agreed upon
by Big B.  (Tr. at 278-79, 281.)  Additionally, Whaley testified that she did not think she would
have agreed to a reduction in the gauge of the bags without a corresponding reduction in the
price.  (Tr. at 590.)  Whaley further testified that before she could accept such a change, she
would have to get approval from her supervisors.  (*Id.*)  Further, this change would not have been
readily apparent to Big B personnel, so they would have had no reason to discover, nor any
reason to suspect, that the gauge had been reduced on the bags.  (*See* Tr. at 118-21.)  Thus, the

42

evidence clearly indicates, and the court finds, that plaintiff had a duty to disclose the reduction in the gauge of the bags.

### b. *Concealment or Nondisclosure of Material Fact*

There is no dispute as to whether plaintiff reduced the gauge of the small, medium, and large merchandise bags supplied to Big B. (Tr. at 334-35.) However, the parties disputed whether that gauge reduction was communicated to Big B. (*See* Tr. at 95, 99, 109-10, 343-52, 354-63.) The court has previously concluded that Elefant's testimony on this issue is not credible, as he repeatedly failed to tell the truth to both Big B and to the court. There is more than a preponderance of evidence that the gauge reduction was implemented without the knowledge or assent of Big B.

Despite Elefant's testimony that the gauge reduction was discussed and agreed upon by the parties, plaintiff failed to produce any documentation that Elefant communicated the gauge reduction to Big B personnel or that he provided samples demonstrating such reduction. Although there was complete absence of any writing discussing the changes to the medium and large bags, Elefant did document in writing his proposal of changing the small bags from low density to high density, and his inclusion of samples demonstrating this proposed change to Big B. (PX 13.) The change in the small bags would have been readily apparent upon observation by Big B personnel, whereas the gauge reduction in the medium and large bags would not have been apparent upon visual examination. (*See* Tr. at 115-122; 340-341.) Thus, Elefant could have implemented (and the court finds he did so implement) the changes to the medium and large bags without Big B's knowledge. Elefant offered no credible explanation for the fact that he did not reference the changes to the medium and large bags in the correspondence with Whaley recommending the changes to the small bags, or in any other correspondence. (*See* Tr.

43

at 342-48, 352, 356-68.)  Further, the court discredits Elefant's testimony that Whaley accepted the gauge reduction for no legitimate reason.  (*See* Tr. at 362.)

Whaley testified that she did not recall any conversations with Elefant in which he disclosed the reduction of the gauges in the bags.  (Tr. at 588-89, 591.)  She further testified that before she could agree to such proposed changes, she would have had to present them to her superiors, Tow and Bruno, for approval.  (Tr. at 590.)  Whaley stated that she did not remember presenting any changes to her bosses after signing the agreement with Elefant.  (*Id.*)  Tow testified that although he remembered discussing the change in the small bag from low density to high density, he had no recollection of a discussion pertaining to reduction in the gauges of the medium and large bags.  (Tr. at 660-61.)  He further testified that he was never provided with samples demonstrating the reduction in gauge in the medium and large bags.  (*Id.*)  Thus, the court is of the opinion that Elefant did not disclose the changes regarding the medium and large bags to Big B personnel.

A material fact for purposes of a fraud action under Alabama law is "a fact of such a nature as to induce action on the part of the complaining party."  *Bank of Red Bay v. King,* 482 So.2d 274, 281 (Ala. 1985).  However, "[i]t is not necessary that the misrepresentation be the sole inducement" for action on the part of the complaining party.  *Id.*  "[I]t is sufficient if [the representation] materially contributes, and is of such character that the [complaining party] would not have consummated the contract, had he known the falsity of the statement, or the fact to be suppressed."  *Marshall,* 387 So.2d at 178 (quoting *Jordan & Sons v. Pickett,* 78 Ala. 331, 338 (1884)).  Generally, it is for the factfinder to determine whether a given fact is material.  *Jim Walter Homes, Inc. v. Waldrop,* 448 So.2d 301, 305 (Ala. 1983).

44

The court finds that plaintiff, acting through its agent Elefant, secretly reduced the gauge in the merchandise bags supplied to Big B, and such gauge reduction was never discussed with nor agreed upon by Big B personnel. Elefant testified that he knew any changes regarding the construction of the bags had to be agreed upon by Big B, and that the gauge of the bags is an important component in the construction of the bags. (Tr. at 278-79, 281.) Further, size and gauge are the primary factors affecting the cost of the bags. (Tr. at 266-68.) Whaley testified that she did not believe she would have agreed to the gauge reduction without a price reduction. (Tr. at 590.) Thus, the court finds that the secret reduction in gauge constitutes a material misrepresentation.

### c.     Inducement

The court also finds that Elefant willfully failed to inform Big B of the gauge reduction in order to induce Big B to accept a cheaper product than that for which it had previously negotiated. Elefant testified that he knew that the bag gauge was an important term in the agreement with Big B, and he knew that any changes in the bag construction had to be agreed upon by Big B. (Tr. at 278-79, 281.) The gauge reduction did not significantly change the appearance of the medium and large bags, and Elefant, therefore, could make the change without Big B's knowledge. (Tr. at 118-21.) There were no credible benefits that Elefant could advance in order to persuade Big B to accept the gauge reduction without a corresponding price reduction. (*See* Tr. at 347-48, 352-65; *compare* DX 43, *with* DX 44, DX 45, and DX 46.) Further, Whaley stated that she did not believe she would have accepted the gauge reduction without a corresponding reduction in price. (Tr. at 590.) Thus, Big B was induced to accept a cheaper product without a corresponding reduction in price. As previously noted, "[i]t is not indispensable that the misrepresentation or concealment shall be the sole inducement; it is

45

sufficient if it materially contributes, and is of such character that the purchaser would not have consummated the contract, had he known the falsity of the statement, or the fact suppressed." *Marshall*, 387 So.2d at 178.

### d.    *Injury*

Finally, Big B suffered damage from the secret gauge reduction in that Big B did not receive the product for which it paid, or the product which plaintiff represented that it was providing to Big B. Instead of receiving the bags that were negotiated and agreed upon, Big B received bags with a lesser gauge, which rendered the bags cheaper and less valuable. (Tr. at 341.) Under Alabama law, the element of damages in a claim for fraud is satisfied upon a showing that the supplier delivered a less valuable product than that which was represented. *See, e.g., Ex parte Norwood Hodges Motor Co.,* 680 So.2d 245, 249-50 (Ala. 1996) (reversing directed verdict on punitive damage claim where the seller delivered a less valuable car than the one for which the buyer negotiated); *Reynolds v. Mitchell,* 529 So.2d 227, 233 (Ala. 1988) ("In an action based on fraud in the inducement of a purchase, the measure of damages is generally the difference between the value of the property as represented and its actual value."); *Curry Motor Co. v. Hasty,* 505 So.2d 347, 351-52 (Ala. 1987) (upholding an award of punitive damages in a fraud action against a seller who delivered a truck with a smaller and less valuable engine than represented to the purchaser).

Additionally, Big B also suffered damage from the secret gauge reduction in that it was fraudulently induced to perform a contract that it had the legal right to rescind. *See Reynolds v. Mitchell,* 529 So.2d 227, 233 (Ala. 1988) ("Because the jury could have determined that there was fraud in the inducement, the jury could have also determined that the plaintiffs relied on the defendants' continuing fraud in the operation of the apartments in making further payments on

46

the notes and that as a result they suffered damage. 37 Am. Jur. 2d Fraud and Deceit § 295

(1968) (one suffers damage where he is fraudulently induced to perform a contract that he has a

legal right to rescind)."). Had Big B discovered the gauge reduction during the term of the

agreement, it would have had the right to rescind the agreement. *See, e.g., Stone,* 77 So. at 557

("A material false statement, relied upon by the other party in ignorance of its falsity, and which

materially influences him to enter into the contract constitutes fraud which will authorize a

rescission."). Thus, defendants (counter-claimants) have established all the elements of fraud as

to MTP's secret gauge reduction in the merchandise bags.

### 2.     *September 1996 Price Increase*

In order to prevail on a claim of misrepresentation, counter-claimants must establish:

"(1) a misrepresentation, (2) of a material existing fact, (3) on which the [counter-claimant]

relied, and (4) which proximately caused injury or damage to the [counter-claimant]." *Goodyear*

*Tire & Rubber Co. v. Washington,* 719 So.2d 774, 776 (Ala. 1998).

#### a.     *Misrepresentation*

The letter from Elefant to Campbell, dated August 19, 1996, (PX 19), contains numerous

material fraudulent misrepresentations. These statements include the representations that:

(1) MTP's resin costs had increased sixty percent between January, 1996, and August, 1996;

(2) MTP's costs associated with the Big B account had increased thirty percent because of the

sixty percent increase in the price of resin; (3) MTP had absorbed all price increases due to the

cost of resin; (4) a fifteen percent increase in MTP's price to Big B would only partially cover

MTP's cost increases; and (5) Elefant was enclosing letters sent "to us" (MTP) confirming the

increase in "our [MTP's] cost[s]." (PX 19.) Additionally, Campbell testified that Elefant stated

in telephone conversations with Campbell that MTP needed a price increase because its resin

47

costs had gone up, but that MTP "would absorb the greatest sum of the increase." (Tr. at 517-18.)

The evidence overwhelmingly indicates that the written and verbal representations noted above were false.  MTP could not have incurred a sixty percent increase in resin costs because MTP did not purchase resin.[34]  (*See* Tr. at 387, 405-06.)  Further, MTP's costs associated with the Big B account did not increase thirty percent during 1996, or at any other time.  (Tr. at 405-09.)  Elefant never attempted to call Dow or other resin suppliers in order to determine the price of resin in January of 1996 or to determine whether resin had increased sixty percent from January, 1996 to August, 1996.  (Tr. at 390-92.)  Further, Elefant never attempted to determine what PCL was paying for resin.  (Tr. at 397-404.)  In fact, the actual increase in MTP's costs between January of 1996, and August of 1996, was only five percent, and this five percent increase did not occur until *after* Elefant made the above representations.  (Tr. at 409, 436.)  Thus, prior to August 19, 1996, the date on which Elefant wrote to Campbell asking for a price increase, MTP had not absorbed any resin price increases.

The court also finds that Elefant knew that the representations made to Campbell in the August 1996 letter and over the telephone were false when he made them.  Elefant conceded at trial that he had these telephone conversations with Campbell, and, although he couldn't remember specifically what he told Campbell over the telephone, he would have made the same type of representations that he made in the August 19, 1996, letter.  (Tr. at 413-14.)  Further,

---

[34] As noted above, resin is used in manufacturing plastic bags. (Tr. at 146, 150, 267; PX 33 at 76.) Although MTP represented to Big B personnel that they were in the manufacturing business, (Tr. at 252-55, 258-62; DX 1.), MTP has no manufacturing facilities. (Tr. at 229-37, 239-42.) Rather, MTP purchased the bags from a manufacturer, PCL. (Tr. at 45, 58.) Therefore, MTP had no reason to purchase resin. (Tr. at 387, 405.)

Elefant acknowledged that these written and verbal representations were made in order to induce Big B to agree to a price increase. (Tr. at 412.) MTP's price increase to Big B more than tripled any cost increases MTP incurred during 1996. (Tr. at 411; *compare* PX 7 and PX 20 *with* PX 10 and DX 29.) Thus, the court concludes that Elefant intentionally misrepresented his costs in order to obtain the 1996 price increase.

### b. *Existing Material Fact*

Further, MTP's misrepresentations concerned material facts. A material fact for purposes of a fraud action under Alabama law is "a fact of such a nature as to induce action on the part of the complaining party." *Bank of Red Bay v. King,* 482 So.2d 274, 281 (Ala. 1985). However, "[i]t is not necessary that the misrepresentation be the sole inducement" for action on the part of the complaining party. *Id.* "[I]t is sufficient if [the representation] materially contributes, and is of such character that the [complaining party] would not have consummated the contract, had he known the falsity of the statement, or the fact suppressed." *Marshall,* 387 So.2d at 178 (quoting *Jordan & Sons v. Pickett,* 78 Ala. 331, 338 (1884)). Generally, it is for the factfinder to determine whether a given fact is material. *Jim Walter Homes, Inc. v. Waldrop,* 448 So.2d 301, 305 (Ala. 1983).

Campbell testified that Elefant's representations regarding the increase in MTP's resin costs formed the basis for his decision to agree to the price increase. (Tr. at 522.) He further testified that he would not have agreed to the price increase had he known that MTP's costs had gone up only five percent rather than the thirty percent which Elefant represented to him in the June, 1996 letter. (Tr. at 522-25.) The court finds credible Campbell's testimony that he would not have agreed to the price increase had he known that MTP's costs had not increased as Elefant had represented. Therefore, the court finds that the misrepresentations regarding MTP's

49

alleged cost increase constituted material facts.[35]

### c. Reasonable Reliance

Reasonable reliance is simply reliance that is reasonable under the circumstances.

*Foremost Ins. Co. v. Parham,* 693 So.2d 409, 419 (Ala. 1997). There is no reasonable reliance if

a person "has reason to doubt the truth of the representation or is informed of the truth before he

acts." *Id.* (internal quotation omitted.) Plaintiff argues in its post-trial brief submitted on January

18, 2000, that there was no reasonable reliance because "Brian Campbell ascertained that Jack

Elefant's quotation of higher prices was consistent with prevailing market prices and Big B or

Revco could not have obtained a better price in the Birmingham area." (Post-Trial Sub. of Pl.

M.T. Packaging, Inc. at 7.)[36] However, the representations pertaining to defendants' fraud claim

---

[35]  MTP argued in its post-trial brief that the representations regarding the price increase were not material because Campbell had compared MTP's prices with prices from other companies and had concluded that MTP's prices were competitive. (Post-Trial Sub. of Pl. M.T. Packaging, Inc., received January 18, 2000, at 6-7.) The court disagrees. Campbell actually contacted one other company about purchasing bags. (Tr. at 522-23, 543.) Campbell provided the sizes of the bags to this other company, but did not specify any additional bag specifications. (Tr. at 523-24.) The prices quoted by this supplier, based upon the limited information provided by Campbell, were competitive with MTP's new pricing scheme. (Tr. at 524, 544.) However, this does not render MTP's misrepresentations immaterial. Further, the statement in plaintiff's brief that "Big B or Revco could not have obtained a better price in the Birmingham area," (Post-Trial Sub. of Pl. M.T. Packaging, Inc., received on Jan. 18, 2000, at 7), is not supported by Campbell's testimony or any other evidence. Finally, Campbell testified that he would not have accepted the price increase had he known MTP's prices didn't increase *even if the new prices were competitive.* (Tr. at 524-25.)

[36]  As previously noted, the total extent of Campbell's efforts to compare MTP's prices with other prices was a single contact with a single bag supplier. (Tr. at 522-23, 543.) Campbell told the supplier the sizes of bags Big B was purchasing, but did not provide any additional bag specifications. (Tr. at 523-24.) Further, Campbell did not raise the resin issue at all with the other bag supplier. (Tr. at 520-21.) The prices quoted by this supplier on the basis of this limited information were competitive with MTP's new prices. (Tr. at 524, 544.) Additionally, the statement in plaintiff's brief that "Big B or Revco could not have obtained a better price in the Birmingham area," has no evidentiary support. (*See* Post-Trial Sub. of Pl. M. T. Packaging, Inc., received on Jan. 18, 2000, at 7.)

50

involve MTP's costs, not its prices.  Campbell's price comparison had nothing to do with MTP's costs.  In fact, inasmuch as Campbell determined that MTP's prices were competitive with another bag supplier, this gave him more reason, not less, to rely on Elefant's statements.

Campbell relied upon Elefant's representation that MTP's costs had increased by thirty percent in determining whether to agree to the price increase.  (Tr. at 522.)  Campbell did not obtain, or attempt to obtain, any information or verification regarding MTP's costs, including resin costs.  (Tr. at 520-21.)  Further, it would have been difficult, if at all possible, for Campbell to verify whether MTP's costs had in fact increased as Elefant indicated.  Thus, the court finds such reliance reasonable under the circumstances.  As the Alabama Supreme Court has noted:

> A purchaser's reliance is reasonable in the absence of independent knowledge sufficient to arouse the purchaser's suspicion, and he is not obligated to make an independent investigation as to the truth of the seller's representations absent such knowledge . . . if the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.

*Ex parte ERA Marie McConnell Realty, Inc.*, No. 1981922, 2000 WL 548172, at *3 (Ala. May 5, 2000) (citations and punctuation omitted).  Campbell did not make an investigation, nor did he have independent knowledge sufficient to arouse suspicion regarding MTP's representations.  Therefore, the court concludes that Campbell reasonably relied on Elefant's statements regarding the 1996 price increase.

### d. Damage

Plaintiff also asserts in its post-trial brief, submitted on January 18, 2000, that defendants have failed to prove "any tangible harm or injury caused by the alleged fraud on plaintiff's part."  (Post-Trial Sub. of Pl. M.T. Packaging, Inc., received on Jan. 18, 2000, at 8.)  The court disagrees.

Big B suffered damage as a result of MTP's misrepresentations in that it agreed to an unwarranted price increase on the bags it was purchasing from MTP. *See City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 573 (11th Cir. 1998) (representations by a product supplier that price increases were due to cost increases, if proven false, could support a claim for fraudulent misrepresentation); *Moore v. Missouri-Nebraska Express Inc.,* 892 S.W.2d 696, 705-06 (Mo. Ct. App. 1994) (affirming jury verdict awarding damages for fraud on basis of misrepresentation that price of fuel paid by truck owners was same as price on invoice to trucking company when the actual price was the cash price less an undisclosed rebate); *Godwin v. Hampton,* 669 S.W.2d 12, 16 (Ark. Ct. App. 1984) (affirming finding of fraud when seller of scrap metal business misrepresented cost and condition of a crane upon which portion of purchase price was based). Thus, defendants (counter-claimants) have established all the elements of fraud as to the 1996 price increase.

### 3. Experts

Plaintiff objected to the expert testimony of defense experts Mark Daniels ("Daniels") and Mark Gallagher ("Gallagher") before and during trial. (*See* Pl.'s Obj. to Def.'s Exhibits, filed October 29, 1999; Supp. Obj. to Def.'s Exhibits, filed November 12, 1999; Trial Tr. at 685, 697, 711-12, 772-73, 778-79, 800-01, 811-12.) The court allowed the experts' opinions, without ruling on their ability to testify as expert witnesses under Rule 702 or as lay witnesses under Rule 701 of the Federal Rules of Evidence. However, the court stated that such testimony could be subject to a post-trial Motion to Strike by plaintiff. (Tr. at 697, 772-73, 801.)

MTP contends that Daniels's testimony regarding resin prices does not satisfy the requirements for admissible expert testimony as articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co. v.*

*Carmichael,* 526 U.S. 137 (1999), as well as by the Eleventh Circuit in *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548 (11th Cir. 1998). (Post-Trial Sub. of Pl. M.T. Packaging, Inc., submitted on January 18, 2000, at 3-5.) Daniels is the National Accounts Manager for Vanguard Plastics, the world's largest manufacturer of T-shirt and merchandise bags. (Tr. at 686-87.) Daniels's testimony primarily related only to plaintiff's damage claims and not to defendants' damage claims. As the court has found in favor of defendants, plaintiff's damage claims are no longer in issue. Thus, the court need not rule as to whether Daniels's testimony regarding plaintiff's damages satisfies the requirements established by *Daubert* and its progeny.

Plaintiff does not challenge Gallagher's testimony under the standards articulated in *Daubert*, except to the extent that he relied upon Daniels's testimony in computing his calculations.[37] (*See* Post-Trial Submission of Pl. M. T. Packaging, Inc., received January 18, 2000 at 4-5.) The only aspect of Daniels's testimony relied upon by Gallagher in computing his calculations was Daniels's testimony concerning the effect that the gauge reduction had on the amount of resin used to manufacture the small, medium, and large bags. (*See* Tr. at 710-11, 814, 824.)

Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in

---

[37] Plaintiff does not dispute, and the court agrees, that Gallagher is qualified as an accountant to provide mathematical calculations. (Post-Trial Sub. of Pl. M. T. Packaging, Inc., received January 18, 2000 at 4-5.)

issue. *City of Tuscaloosa,* 158 F.3d at 562. The court is of the opinion that Daniels's eleven

years working in the plastic bag industry and extensive training in the manufacturing process of

plastic bags qualified him to testify in this regard. *(See* Tr. at 686-87.)[38] The court is also of the

opinion that Daniels's resin reduction calculations are reliable, inasmuch as they are common

mathematical formulas. *(See* Tr. at 708-10.) The court further concludes that such testimony

assists the trier of fact in determining a fact in issue, that is, the damage defendants suffered as a

result of the gauge reduction. Thus, the court is of the opinion that Gallagher was permitted to

rely on the resin reduction figures provided by Daniels in calculating defendants' damages

regarding the gauge reduction.[39] Thus, the court concludes that Gallagher's testimony is

admissible.

### 4. *Damages*

#### a. Compensatory Damages

The measure of defendants' damages for fraud in the inducement of the purchase of the

reduced-gauge bags is the "difference between the value of the property as represented and its

actual value." *Reynolds v. Mitchell,* 529 So.2d 227, 233 (Ala. 1988). In calculating defendants'

damages resulting from the gauge reduction, Gallagher multiplied the percentage reduction in

resin resulting from the gauge reduction, by the purchase price of the small, medium, and large

---

[38] Plaintiff objected to Daniels's expert testimony regarding resin prices. *(See* Tr. at 685, 697.) However, resin prices do not affect the calculation of defendants' damages for the secret gauge reduction. (Tr. at 853.)

[39] The other factors which Gallagher utilized in computing defendants' damages resulting from the gauge reduction were the fifty percent resin-to-cost factor to which Elefant testified, and information regarding the selling prices and quantities sold obtained from the MTP invoices. (Tr. at 814; DX 40, section 4.) The parties stipulated that the invoices contained in PX 42 constitute the complete sets of invoices from PCL to MTP and from MTP to Big B. *(See* Tr. at 132, 135, 422.)

bags. (Tr. at 814.) This number was then multiplied by fifty percent to arrive at a per unit overcharge. (DX 40, section 4; Tr. at 814.) The per bag overcharge was then multiplied by the number of bags sold to arrive at a total overcharge amount for all three bag sizes.[40] (DX 40, section 4; Tr. at 814-15.) The overcharges were $47,354 as to the Big B bags and $8,111 as to the Drugs For Less bags, with a total overcharge of $55, 465. (DX 40, section 4; Tr. at 815.)[41]

Gallagher's calculation of damages pertaining to the fraudulent price increase was not dependent upon Daniels's testimony. (*See* DX 40, section 3.) Gallagher multiplied the difference in the selling prices per bag before and after the price increase by the number of bags sold. (DX 40, section 3; Tr. at 815-17.) These numbers were extracted from MTP's invoices. (Tr. at 817; *see* DX 42.) Gallagher calculated $30,637 ($26,934 for the Big B bags and $3,704 for the Drugs For Less bags) in damages associated with the fraudulent price increase. (DX 40, section 3; Tr. at 817.) However, as acknowledged in defendant's post-trial brief, "Gallagher's calculation fails to give MTP credit for PCL's five percent price increase." (Def.'s/Counter-Pl.s' Resp. to Jan. 18, 2000 Post-Tr. Sub. of Pl. M.T. Packaging, Inc., submitted on February 18, 2000, at 17.) Once plaintiff is given credit for the five percent increase in its costs, the damages

---

[40] Extra large bags were not included in the 1995 agreement between Elefant and Whaley. (PX 7.) Big B did not begin ordering extra large bags until August of 1995. (Tr. at 275-76, 375-76, 466-67; DX 47; DX 48.) However, the gauge reduction occurred in June of 1996. (*See* PX 12; PX13; Tr. at 95, 99, 109-10, 343-52, 354-63.) Thus, there was no fraudulent gauge reduction involving the extra large bags.

[41] In case the court determined that Gallagher's testimony was due to be stricken, defendants provided an alternate method of calculating damages. (*See* Defs/Counter Pls.' Resp. to January 18, 2000 Post-Trial Sub. of Pl. M.T. Packaging, Inc. at 15-16.) This method resulted in a damage calculation of $125,300. (*Id.* at 16.) The court notes that this calculation is based on other evidence introduced at trial and is also an appropriate calculation. However, because the court has determined that Gallagher's testimony pertaining to these damages is admissible, the court has chosen to rely on his calculation.

55

resulting from the price increase total $21, 912.[42] The calculations are as follows:

| | | | |
|---|---|---|---|
| Small Bag: | $11.16 - $9.70 - ($7.22-$6.88) | = | $1.12 |
| | $ 1.12 ÷ 1,000 | = | $ 0.00112 |
| | $ .00112 x 2,740,000 | = | $3,069 |
| Medium Bag: | $16.98 - $14.76 - ($12.47 - $11.88) | = | $1.63 |
| | $1.63 ÷ 1,000 | = | $ 0.00163 |
| | $ .00163 x 2,045,000 | = | $3,333 |
| Large Bag: | $23.46 - $20.40 - ($18.86 - $17.92) | = | $2.12 |
| | $2.12 ÷ 1,000 | = | $ 0.00212 |
| | $ .00212 x 5,446,000 | = | $11,546 |
| Extra Large Bag: | $38.53 - $33.50 - ($28.67 - $27.31) | = | $3.67 |
| | $3.67 ÷ 1,000 | = | $ 0.00367 |
| | $ .00367 x 1,080,000 | = | $3,964 |
| Total: | | | $21, 912. |

The court concludes that defendants suffered $55,465 in damages resulting from the gauge

reduction and $21,912 in damages resulting from the price increase. Thus, the court concludes

that defendants are entitled to $77,377 in compensatory damages.

### b.    Punitive Damages

Under Alabama law, punitive damages may be awarded "where it is proven by clear and

convincing evidence[43] that the [counter-]defendant consciously or deliberately engaged in . . .

---

[42] Gallagher's testimony at trial failed to take into account the five percent increase in MTP's costs. However, this calculation may be computed by (1) subtracting MTP's old selling price to Big B from the new selling price; (2) subtracting the difference between MTP's old and new selling prices from PCL's selling price to MTP; (3) dividing this number by 1,000 in order to determine the overcharge per bag; and (4) multiplying the per bag overcharge by the number of bags sold at the inflated price. (Def./Counter-Pl.s' Response to Jan. 18, 2000 Post-Trial Sub. of Pl. M.T. Packaging, Inc., received Feb. 18, 2000, at 17-18; *see also* DX 28, 29, 42, 47, 48; PX 7, 10; Tr. at 377-78.)

[43] Clear and convincing evidence is defined as "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each

fraud with regard to the [counter-claimant]." Ala. Code § 6-11-20(a) (1975). Thus, "punitive damages may be awarded only where the plaintiff presents clear and convincing evidence indicating that the defendant acted consciously or deliberately." *Morgan Building v. Gillett,* 762 So. 2d 366, 370 (Ala. Civ. App. 2000). The Alabama Code defines fraud as "[a]n intentional misrepresentation, deceit, or concealment of a material fact that the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." Ala. Code § 6-11-20(b)(1) (1975). The Alabama Supreme Court has defined "gross" fraud as fraud "that is inexcusable, flagrant, or shameful." *Alfa Mutual Fire Ins. Co. v. Thomas,* 738 So.2d 815, 821 (Ala. 1999).

The purpose of awarding punitive damages is to punish the wrongdoer and to protect the public by deterring the wrongdoer and others from committing such wrongs in the future. *Ex parte Lewter*, 726 So.2d 603, 606 (Ala. 1998); *see also* Alabama Pattern Jury Instruction 11.03. Although punitive damages must not exceed an amount that will accomplish the goals of punishment and deterrence, they need not bear a particular relationship to compensatory damages. *See, e.g., Independent Life and Accident Ins. Co. v. Harrington,* 658 So.2d 892, 900 (Ala. 1994).

The United States Supreme Court has set forth three factors to consider in determining the appropriate amount of punitive damages to be awarded: (1) the degree of reprehensibility of the defendant's action; (2) the ratio between the punitive damages award and the compensatory damages award or actual harm suffered; and (3) a comparison of the punitive damages award to

---

essential element of the claim and a high probability as to the correctness of the conclusion." Ala. Code § 6-11-20(b)(4) (1975).

the civil or criminal penalties that could be imposed for comparable misconduct. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575-85 (1996) ("BMW I").

The Alabama Supreme Court subsequently held that the three guideposts established in BMW I did not exclude a court's consideration of the factors previously prescribed in *Green Oil v. Hornsby,* 539 So.2d 218 (Ala. 1989) and *Hammond v. City of Gadsden,* 493 So.2d 1374 (Ala. 1986). *BMW of North America, Inc. v. Gore,* 701 So.2d 507, 509-10 (Ala. 1997) ("BMW II"). These factors include: (1) whether there is a reasonable relationship between the punitive damages award and the harm that has actually occurred and is likely to occur because of the wrongdoer's misconduct; (2) the reprehensibility of the wrongdoer's conduct; (3) the profit gained by the wrongdoer because of the misconduct; (4) the wrongdoer's financial position;[44] (5) the costs of litigation; (6) whether criminal sanctions have been or could be imposed on the wrongdoer because of the same conduct; and (7) other civil actions against the same party based on the same conduct. *Id.* at 901-02 (quoting *Green Oil,* 539 So.2d at 223-24).

Moreover, the Alabama Code enumerates certain factors which must be considered: (1) the economic impact of the verdict on the defendant or on the plaintiff;[45] (2) the size of the compensatory damages award; (3) whether the defendant has previously been guilty of the same misconduct; and (4) any effort on the part of the defendant to remedy the wrong complained of and the opportunity to do so. Ala. Code § 6-11-23(b) (1975). Although the courts list these factors as pertinent to review of a jury award of punitive damages, the court will analyze these

---

[44] Although no document in the record references the net worth of MTP, the court considered this factor in calculating punitive damages by assessing the profit MTP generated in its contracts with Big B as well as MTP's contracts with other large business.

[45] *See* n.44.

58

same factors in determining an appropriate punitive damage award in the case at bar.

After carefully reviewing the evidence, the court concludes that MTP's representation that it had incurred a thirty percent price increase and its failure to disclose that the gauges of the bags had been reduced constitutes gross fraud, that is fraud that was shown by clear and convincing evidence to be inexcusable, flagrant, or shameful. Having analyzed the facts of this case pursuant to the factors mandated by the Supreme Court in BMW I, the additional factors suggested by the courts in *Hammond* and *Green Oil*, and the factors outlined in Alabama Code § 6-11-23(b) (1975), the court concludes defendants are entitled to a punitive damage award of $232,131.

This amount appropriately accounts for the reprehensibility of MTP's conduct. MTP engaged in repeated acts of fraud extending over a period of more than one year. Further, MTP profited greatly from its fraudulent conduct. The fraudulent conduct was committed by a high level officer of the company, and there was no evidence that anyone at MTP attempted to remedy the fraudulent conduct. (*See* Tr. at 40-41.) Moreover, MTP's fraudulent conduct extended to its conduct during this litigation, including false allegations in the Complaint, false interrogatory answers, and false testimony by the corporate representative at trial. (*See* Tr. at 44, 45, 229-33, 290-97; Complaint ¶ 6; Amended Complaint ¶ 6.)

An amount of $232,131 reflects a ratio of 3:1 between the punitive damage award and the compensatory damage award. This ratio is within the acceptable constitutional range discussed in BMW I. *See* 517 U.S. 559. Further, "[w]hile recognizing that there is no set mathematical formula for determining an award of punitive damages, the Alabama Supreme Court has suggested a ratio of 3 to 1 as a 'benchmark' from which to determine reasonableness and fair punishment." *Kmart Corp. v. Kyles,* 723 So.2d 572, 584 (Ala. 1998) (citations omitted).

Additionally, this amount is within the range of other civil penalties for comparable conduct. The Alabama Deceptive Trade Practices Act provides that a party in violation of the Act may be liable for up to three times any actual damages sustained. *See* Ala. Code §§ 8-19-5, 8-19-10(a)(2) (1975). Given the extent to which plaintiff has engaged in fraudulent conduct and has taken steps to conceal such conduct, the court concludes that defendants are entitled to a punitive damage award of $232,131, which is three times the amount of compensatory damages to which defendants are entitled. This award is sufficient to punish plaintiff for its previous fraudulent conduct and to deter plaintiff from engaging in such conduct in the future.

## II.  CONCLUSION

Based upon the foregoing, the court finds in favor of defendants as to plaintiff's claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. The court further finds that defendants are entitled to a rescission of the executory portion of the 1996 contract and to recover damages for the portion of the contract that had been performed. *See Hillcrest Center, Inc. v.* Rone, 711 So.2d 901, 907 (Ala. 1997) ("the remedy of allowing rescission of a contract executed as the result of fraudulent misrepresentations is not inconsistent with a monetary award for the damage resulting from the fraud"). The court finds in favor of the defendants as to their counterclaim of fraudulent misrepresentation and non-disclosure and finds that defendants are due $77,377 in compensatory damages and $232,131 in punitive damages.

DONE this 29th day of September, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge

60